

# TRACY WINKLER
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**October 31, 2013 11:44 AM**
**TRACY WINKLER**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 291177**

**HEATHER PICKETT**

**vs.**

**ABUBAKAR ATIQ DURRANI MD**

**A 1307306**

**FILING TYPE: INITIAL FILING (OUT OF COUNTY) WITH JURY DEMAND**

**PAGES FILED: 139**

EFR200

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO
CIVIL DIVISION

| | | |
|---|---|---|
| **HEATHER PICKETT** | : | |
| 255 East 4th Street | : | |
| Williamsburg, OH 45176 | : | |
| | : | Case No. |
| | : | |
| | : | Judge |
| | : | |
| **Plaintiff,** | : | **COMPLAINT &** |
| | : | **JURY DEMAND** |
| | : | |
| **v.** | : | |
| | : | |
| **ABUBAKAR ATIQ DURRANI, M.D.** | : | |
| 6905 BURLINGTON PIKE | : | |
| FLORENCE, KY 41042 | : | |
| (Serve via Certified Mail) | : | |
| | : | |
| And | : | |
| | : | |
| **CENTER FOR ADVANCED SPINE** | : | |
| **TECHNOLOGIES, INC.** | : | |
| 6905 BURLINGTON PIKE | : | |
| FLORENCE, KY 41042 | : | |
| | : | |
| Serve: CT Corporation System | : | |
| 1300 East 9th St. Ste 1010 | : | |
| Cleveland, OH 44114 | : | |
| (Serve via Certified mail) | : | |
| | : | |
| And | : | |
| | : | |
| **CHILDREN'S HOSPITAL** | : | |
| **MEDICAL CENTER** | : | |
| 3333 BURNET AVENUE | : | |
| CINCINNATI, OH 45229 | : | |
| | : | |
| Serve: Frank C. Woodside III | : | |
| 1900 Chemed Center | : | |
| 255 E. Fifth Street | : | |
| Cincinnati, OH 45202 | : | |
| (Serve via Certified mail) | : | |
| | : | |

1

And                                                         :
                                                            :
**WEST CHESTER HOSPITAL, LLC**                              :
7700 UNIVERSITY DRIVE                                       :
WEST CHESTER, OH 45069                                      :
                                                            :
SERVE: GH&R BUSINESS SVCS., INC.                            :
511 WALNUT STREET                                           :
1900 FIFTH THIRD CENTER                                     :
CINCINNATI, OH 45202                                        :
(Serve via Certified mail)                                  :
                                                            :
And                                                         :
                                                            :
**UC HEALTH**                                               :
SERVE: GH&R BUSINESS SVCS., INC.                            :
511 WALNUT STREET                                           :
1900 FIFTH THIRD CENTER                                     :
CINCINNATI,OH 45202                                         :
(Serve via Certified mail)                                  :
                                                            :
        **Defendants.**                                     :

---

Comes now Plaintiff, Heather Pickett, and files this Complaint and jury demand,

and states as follows:

## FACTUAL ALLEGATIONS OF PLAINTIFF

1.  At all times relevant, Plaintiff, Heather Pickett (hereinafter "Plaintiff, Plaintiffs or

    Ms. Pickett"), was a resident of and domiciled in the State of Ohio.

2.  At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr.

    Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.  At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter

    "CAST"), was licensed to and did in fact perform medical services in the State of

    Ohio, and was and is a corporation authorized to transact business in the State of Ohio

    and Kentucky.

2

4. At all times relevant herein, Children's Hospital Medical Center. (hereinafter "Children's Hospital") held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

5. At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operating under the trade name West Chester Hospital.

6. At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which included, owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

7. At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

8. The amount in controversy exceeds the jurisdictional threshold of this Court.

9. The subject matter of the Complaint arises out of medical treatment by the Defendants in primarily in Hamilton County, Ohio but with one procedure performed in Butler County, Ohio. This Court is thus the proper venue to grant the Plaintiffs the relief they seek.

3

10.     In or around December 20005, Ms. Pickett began to experience foot drop and she
        was referred to Dr. Durrani, who at that time was working at Children's Hospital.

11.     At her first appointment with Dr. Durrani, Dr. Durrani told her she required back
        surgery despite no pre-operative pain complaints.

12.     Dr. Durrani further informed her that if she didn't undergo the surgery within two
        week she would become paralyzed.

13.     Upon information and belief, Dr. Durrani utilized Infuse/BMP-2 "off-label"
        without Ms. Pickett's or her parents' informed consent.

14.     Infuse/BMP-2 is not approved by the FDA for use in children under the age of 21.

15.     In January 2006, Dr. Durrani performed a T-spine fusion on Ms. Pickett at
        Children's Hospital.

16.     At the time of January 2006 surgery, Ms. Pickett was 16 years old.

17.     Following the surgery, Ms. Pickett experienced right leg swelling and
        incontinence issues that she never had prior to the surgery.

18.     Ms. Pickett still has swelling in her right leg to the present day that has never
        dissipated.

19.     Following the surgery, Ms. Pickett continued her follow up care with Dr. Durrani
        at Children's Hospital.

20.     Dr. Durrani told Ms. Pickett in her follow-up appointments that her leg swelling
        was "normal."

21.     Upon information and belief, the January 2006 surgery at Children's hospital was
        medically unnecessary and/or improperly performed.

22.     When Dr. Durrani left his employment at Children's Hospital in or around

4

December 2008, Ms. Pickett continued to regularly treat with Dr. Durrani at his CAST offices.

23. In the time since the 2006 surgery, Ms. Pickett developed significant back pain.

24. Sometime in 2012, Dr. Durrani recommended that Ms. Pickett undergo another back surgery. In December 2012, Ms Pickett underwent a laminectomy procedure at West Chester Hospital.

25. During this surgery, Dr. Durrani utilized Baxano to shave her spinal bone out.

26. It is believed that this was a required as a direct result of Dr. Durrani's negligent use of BMP-2 in 2006 on Ms. Pickett which caused unnatural bone overgrowth in Ms. Pickett's spine.

27. Following the surgery, Ms. Pickett's back pain continued and actually became even worse.

28. During the December 2012 surgery, Dr. Surrani made improper use and selection of utilizing Baxano to treat Ms. Pickett.

29. During Dr. Durrani's treatment of Ms. Pickett, Dr. Durrani took advantage of a person who had little to no capacity to appreciate the significance of the procedures he wished to perform on her.

30. Before these surgeries, Ms. Pickett was able to walk and presently Ms. Pickett is now barely able to walk or keep her balance.

31. Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and/or improperly performed.

32. As a direct and proximate result of these surgeries, Ms. Pickett has suffered damages.

5

## GENERAL ALLEGATIONS PERTINENT TO DR. DURRANI

33.     Under CR8, this Complaint contains many "short and plain" statements supporting Plaintiff's relief. Each averment is simple, concise and direct. Under CR8(E)(1), there are "no technical forms of pleading."

34.     In this pleading, Dr. Mohammad Abubakar Atiq Durrani is referred as Dr. Durrani. The Center of Advanced Spine Technologies is referenced as CAST. West Chester Hospital, LLC and West Chester Medical Center are at times referenced as West Chester. UC Health is referenced as UC Health and collectively with West Chester Hospital, LLC at times as West Chester/UC Health. Children's Hospital of Cincinnati, Inc. is referenced as Children's Hospital and Children's.

35.     Furthermore, under CR8(F), "all pleadings shall be so construed as to do substantial justice."

36.     Under CR9(B), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

37.     Plaintiffs' not only state fraud with particularity in this pleading, Plaintiffs can prove malice, intent and knowledge despite only being required to aver generally.

38.     Pursuant to CR10, the paragraphs of this Complaint each are limited to a statement of a single set of circumstances.

39.     Under CR10(C), "statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion."

6

40.    Plaintiffs' Complaint detail their individual specific factual allegations pertaining to their treatment and procedures by Dr. Durrani and the employees and agents of the relevant Defendant hospital pertaining to each Plaintiff.

41.    What is pled in this Complaint is just not being alleged, it can and will be proven. It is based in part on limited discovery to date and witnesses who have come forward with relevant information.

42.    Under CR9(B), Plaintiffs in their Complaint in this pleading will:

        A.    Specify the statements attributed to Defendants claimed to be false.

        B.    State the circumstances surrounding the making of the allegedly false. statements, including time and place.

        C.    Identify the persons claimed to have made the statement.

        D.    Set forth the specific damages suffered as a result of the fraud.

43.    The Defendants have in their possession their bills pertaining to each Plaintiff. Defendants prepared them. They sent them to Plaintiffs. These bills have the dates of claimed services and describe the alleged services.

44.    Plaintiffs follow their lead. Defendants can't claim lack of notice and knowledge of their own bills.

45.    The dates of the informed consents are contained in the medical records of Defendants and are in their possession.

46.    Defendants in Motions reminded everyone that Ohio has notice pleading and they needed to be properly put on notice of what the allegations and claims are so they can properly respond.

47.    The Complaint provides plenty of notice.

7

48.    The Plaintiffs did not learn of Dr. Durrani's fraud upon them until their post-Durrani care spine surgeons informed them of the unnecessary spine surgery based upon their post-Durrani care spine surgeons review of the Durrani pre-op radiology. The strength of Plaintiffs' cases are that they are based upon the objective proof of radiology.

49.    The Plaintiffs had limited knowledge of the hospital culpability until recent months when witnesses came forward with relevant information.

50.    Further discovery, including depositions and Defendants answering the outstanding written discovery due on other cases will provide more specifics.

51.    The Defendants have already been formerly identified in the Complaints.

52.    Corporations act through people. People have responsibility to fulfill their duties. When they fail in their duties, in circumstances where great harm occurs, they must be held accountable as individuals.

53.    Not for melodrama, but for purpose, context and relevancy to the institutional negligence and the total disregard of the health and well being of a human life, Plaintiffs plead the duty of the Hippocratic Oath taken by Dr. Durrani and all doctors and nurses involved in the tragedy that will always be known as the Dr. Durrani Case:

"At the time of being admitted as a member of the medical profession:

- I solemnly pledge to consecrate my life to the service of humanity;
- I will give to my teachers the response and gratitude that is their due;
- I will practice my profession with conscience and dignity;
- The health of my patient will be first consideration;
- I will respect the secrets that are confided in me, even after the patient has died;

8

- I will maintain by all the means in my power, the honor and the noble traditions of the medical profession;

- My colleagues will be my sisters and brothers;

- I will not permit considerations of age, disease or disability, creed, ethnic origin, gender, nationality, political affiliation, race, sexual orientation, social standing or any other factor to intervene between my duty and my patient;

- I will maintain my utmost respect for human life;

- I will not use my medical knowledge to violate human rights and civil liberties, even under threat;

- I make these promises solemnly, freely and upon my honor.

54.     The Plaintiff suffered the described harm at the hands of Dr. Durrani while Dr. Durrani operated under the auspices of his corporation he solely owned, CAST.

## ALLEGATIONS AGAINST DR. DURRANI AND HIS PRACTICE

### (These Facts Apply to All Defendants)

55.     Dr. Durrani is a citizen of the Republic of Pakistan and is a permanent resident of the United States of America. He is not a citizen of the United States of America.

56.     From approximately 2005 to the present, Dr. Durrani has worked as a spine surgeon in Southwest Ohio, primarily in Cincinnati, Ohio in Hamilton and Butler County and in Northern Kentucky in Boone County.

57.     Beginning in 2008, Dr. Durrani opened a private practice called Center for Advanced Spine Technologies, Inc. ("CAST").

58.     Dr. Durrani is the sole owner of CAST.

9

59.     CAST currently has two offices, one in Evendale, Ohio at 10475 Reading Road,
Suite 206, Cincinnati, Ohio, 45241, and one in Northern Kentucky at 6905B Burlington
Pike, Florence, KY 41042.

60.     From at least 2009 through the present, Dr. Durrani performed numerous spine
surgeries through his private practice, CAST, including all the ones of Plaintiffs relevant
to their causes of action.

61.     The surgeries were often performed at different hospitals in the Cincinnati area or
through an outpatient surgery facility called Journey Lite Surgery Center (Journey Lite).
The Journey Lite facility is owned in part by Dr. Durrani and is also located at 10475
Reading Road, Cincinnati, Ohio 45241.

62.     Dr. Durrani previously had privileges to perform surgeries at Children's Hospital,
Christ Hospital, Deaconess Hospital, Good Samaritan Hospital, and West Chester
Hospital, but no longer has privileges at any of those hospitals based upon those hospitals
no longer wanting to grant him privileges.

63.     From approximately 2011 through May 2013, Dr. Durrani primarily performed
surgeries at Journey Lite and West Chester Medical Center.

64.     As of May 2013, Dr. Durrani no longer has privileges at West Chester Medical
Center.

65.     Throughout his practice at CAST, Dr. Durrani, West Chester/UC Health, Journey
Lite and Children's provided medical services to recipients of Medicare, Medicaid,
Anthem, Humana, United HealthCare, and other healthcare benefit programs as that term
is defined in Section 24(b) of Title 18, United States Code.

10

66.     In July 2009, Dr. Durrani was charged with domestic violence in Warren County-537.14 M1. The relevancy to the claims is Dr. Durrani's views and prejudices towards women which are a part of this story.

67.     Multiple times a year for extended periods, Dr. Durrani travels to and from Pakistan, the place of his birth and childhood and his country.

68.     Dr. Durrani has told some Plaintiffs, patients and co-workers he's a Prince in Pakistan. A lie. In a deposition, Dr. Durrani mocked this allegation by stating Pakistan is not a monarchy so he could not be a Prince so he would never claim to be one. However, numerous Plaintiffs, patients and employees at Defendant hospitals maintain he represented he was a Prince. The relevancy to the claims is that Dr. Durrani's narcissism is a factor in the claims of Plaintiffs.

69.     Dr. Durrani maintains his family owns an international textile business, which makes him independently wealthy. A lie. In one deposition, he claimed he only had $2,000 when he came to America.

70.     Dr. Durrani claims ownership of a surgical tool business in Pakistan. This has not been verified or refuted.

71.     Several state and federal agencies have opened investigations into Dr. Durrani's surgical practices and his billing practices.

72.     Tri-state orthopedic and neurosurgeon doctors support Plaintiffs' medical malpractice, fraud and battery claims against Dr. Durrani. Anyone familiar with medical malpractice claims recognizes the significance of a local physician testifying against another physician.

11

73.     Dr. Durrani's Application to the Kentucky Board of Medical Licensure includes many discrepancies including the following:

   a.  The date he attended and graduated from the Army Medical College, Rawalpindi, Pakistan.

   b.  Not reporting he had a South Carolina license

   c.  It's unclear if he's board certified.

   d.  Inconsistent dates of birth.

   e.  Did not timely complete the Kentucky HIV/AIDS education.

   f.  Inconsistent dates of residency and fellowship training.

   g.  A September 16, 2004, claims he has had no accreditations.

   h.  The credentials Analysis Report states the following omissions-

      i.   The Postgraduate Medical Education form completed by Children's Hospital Medical Center was not sealed or notarized.

      ii.  The Postgraduate medical Education form completed by Texas Scottish Rite Hospital for Children was not sealed or notarized.

      iii. Score Transcripts for the NBME Parts I and II as reported by the applicant are not enclosed.

   i.  He did not complete his full fellowship from the University Of Florida College Of Medicine.

   j.  He barely passed the Nevada and Ohio Boards.

   k.  In 2008, he falsely claimed hospital staff privileges in Kentucky.

74.     Dr. Durrani is a pathological liar.

12

75.     Dr. Durrani admits in his deposition testimony he has numerous family members in the Pakistani government, but refused to name them.

76.     According to Dr. Durrani himself, as published by him on August 5, 2013: "The University of Cincinnati Orthopedic Education and Research Fund has granted Atiq Durrani the funds to research local biochemical regulation of physical growth in a rat model." This is further proof of the UC Health connection to Dr. Durrani prior to his arrival at West Chester.

77.     According to Dr. Durrani himself, as published by him on July 22, 2013: "In July of 1999, Atiq Durrani entered the Orthpedic Residency Training Program at the University of Cincinnati, Department of Orthopedic Surgery in Ohio." This is further proof of the UC Health connection prior to his arrival at West Chester.

78.     In one of his Word Press ramblings, Dr. Durrani reports on grants he receives:

     A.  Synthes Spine- $70,000 a year

     B.  Medtronics- $59,170 a year

     C.  DePuy Spine- $74,790 a year

     D.  Wright Medical- 2008

     E.  Johnson & Johnson- $36,000

79. This contradicted his deposition testimony where he claims he's not paid money by companies. He claimed to be a "free" consultant. It also supports the new reality. Dr. Durrani is Exhibit A of pay me and I'll do and say what you want me to do regardless of patient safety. This is a past, current and present danger in healthcare in America.

13

80. To this day, Dr. Durrani continues to misrepresent his status and his situation to the public.

81. Dr. Durrani self publishes self promotions obviously self written that border on the comical, but clearly narcissistic and delusional.

82. On MagCloud: Atiq Durrani added high honor to his sterling resume when he was awarded the Award of Honor in Orthopaedic Surgery by the National Institute of Medicine in 2013. The award is the latest in a long string of awards which renowned spinal surgeon Atiq Durrani has received in his career, including being named one of America's Top Orthopaedist in 2011. In addition Atiq Durrani was a Whitecloud Award Nominee for best Clinical Paper in 2010 and has been awarded several prestigious fellowships and trusteeships.

83. On Professional On The Web: Renowned spinal surgeon and founder of CAST (the Center for Advanced Spine Technologies), Atiq Durran has earned a reputation as a consummate professional and a man of unimpeachable moral fiber. Atiq Durrani has been the recipient of a slew of awards and accolades in his distinguished career, including being named on of America's Top Orthopedist in 2011 and being given the Award of Honor in Orthopedic Surgery by the National Institute of Medicine in 2013. Atiq Durrani's pioneering techniques have made many of his spinal surgeries into outpatient procedures.

84. From Word Press: Written by Dr. Durrani as declared on August 12, 2013: "As a leader in orthopedic medicine, Atiq Durrani as made monumental achievements in his field of research and practice." "Atiq Durrani is revolutionizing the field of medicine in a way that has never been done before, making him a leader in his field." "Atiq

14

Durrani has now established some of the most advanced orthopedic procedures in history and around the world. Atiq Durrani's work is being read, taught, and replicated all around the world."

85. Written by Dr. Durrani as declared on August 3, 2013: "The research of Atiq Durrani is the leading research in the field of orthopedics."

86. Written by Dr. Durrani as declared on July 29, 2013: "Atiq Durrani's achievements are known world-wide as the latest in orthopedic procedures and research." "Atiq Durrani has developed the most advanced spine program in the world, making his work the leading research in the field." "Atiq Durrani is revolutionizing the field of orthopedics and orthopedic surgery." "As he continues to excel in his area of specialty, Atiq Durrani gains more recognition around the world." "Atiq Durrani is at the forefront of his career, and is changing the way orthopedics is being performed by doctors from all over the world."

87. Written by Dr. Durrani as declared on July 27, 2013: "In 2005, Atiq Durrani was named a Trustee at the University of Orthopedic Research and Education Foundation."

88. "Atiq Durrani was also awarded the Award of Honor in Orthopedic Surgery by the National Institute of medicine in 2013."

89. So despite being under federal indictment, facing federal lawsuits and over 300 medical malpractice cases and certain license action, Dr. Durrani claims to be the #1 Orthopedic in the world.

## DR. DURRANI'S CRIMINAL CHARGES IN SUPPORT OF FRAUD AND BATTRY CLAIMS

15

**(These Facts Apply to All Defendants)**

90.    On July 25, 2013, Dr. Durrani was arrested and charged with Health Care Fraud and Making False Statements relating to Health Care by federal authorities.

91.    A federal investigation remains ongoing into Dr. Durrani.

92.    A state criminal and licensing investigation remains ongoing.

93.    On August 8, 2013, a federal grand jury indicted Dr. Durrani for his conduct pertaining to surgeries he performed at West Chester/UC Health including performing unnecessary surgeries and billing private and public healthcare benefit programs for those fraudulent services.

94.    The Indictment is filed in Case No. 1:13CR-084, USA v. Abubakar Atiq Durrani and is adopted and incorporated herein in its entirety and pursuant to CR10, it is attached as an Exhibit.

95.    Several of the Plaintiffs cooperated with the United States Attorney's office in securing the indictment and are referenced in the indictment by a patient number. This is no secret to Defendants who by the descriptions know who they are, but the United States appropriately concealed their identity to the public.

96.    Dr, Durrani's bond conditions prohibit him from traveling outside the Southern District of Ohio and the Eastern District of Kentucky. It requires his passport to be surrendered, but it does not prohibit him from practicing medicine. It requires him to notify his patients of the pending charges.

97.    According to a public filing in the federal criminal case, USA v Durrani, 1:13-08 CR-00084, Government's Response to Defendant's Second Motion to Modify Conditions

16

of Release, the United States believes Dr. Durrani is a flight risk. This should also concern this Court.

98.     Although charged with ten counts of healthcare fraud and false statements, the United States stated in their Response: "the scheme and evidence involves a much larger number of patients." The Plaintiffs are part of that larger number.

99.     The Response continues: "unlike a case involving simple billing fraud, this case alleges that the Defendant performed harmful and unnecessary procedures on patients. As a result, the focus is not simply on an amount of money paid, but on the significant, physical damage the Defendant caused to individuals and their families." This would include Plaintiffs.

100.    The Response states: "Additional charges are expected."

101.    As it is rare for local physicians to support a local malpractice claim, it is further a rare circumstance that the Defendant physician has federal criminal charges. It both reinforces the seriousness of the conduct and provides credibility to these claims. Dr. Durrani, their Defendants and their legal counsel claim are frivolous.

102.    Dr, Durrani brazenly recently announced the formation of the Minimally Invasive Spine Institute which plans to open up offices in Dayton and Columbus.

103.    Dr. Durrani also owns a company called Evolution Medical, LLC.

104.    Medicaid recently has suspended Dr. Durrani as a provider for Medicaid beneficiaries.

105.    Anthem has suspended Dr. Durrani as an authorized provider.

17

106.    The treaty between the United States and Pakistan limits the terms that qualify for
extradition causing further flight risk concerns. Defendants legal counsel also claims to
Plaintiffs counsel that Dr. Durrani fleeing could affect his liability coverage.

107.    When arrested, Dr. Durrani falsely told government investigators he was assisting
the FBI in an investigation of Eric Deters for calling Dr. Durrani the Butcher of Pakistan.

108.    In a sick gesture, Dr. Durrani attempted to use his wife and children as a "trading
card" in his bond request, when he has lived separately from them for years. In exchange
for allowing Dr. Durrani to travel to Pakistan, he offered up his wife's and children's
passports.

109.    Employees of Dr. Durrani have confirmed sexual and romantic relationships with
Jamie Moor, a former Physician Assistant and Beth Garrett, a nursing school drop-out.
This sordid information apologetically is relevant to Plaintiffs claims as detailed later
because these relationships affected Dr. Durrani's patient care of Plaintiffs.

110.    Dr. Durrani was actually arrested by the federal government at the home of Beth
Garrett.

111.    Dr. Durrani has opened The Spine Institute in Pakistan at Lahore and Multon,
Pakistan.

112.    Dr. Durrani in a Motion to Modify Conditions of Release in his federal criminal
trial wants to eliminate the patient notification of his criminal charges, not just for repeat
patients, but any new patients within the tri-state area.

113.    The fact Dr. Durrani makes this request proves he wants to continue his continued
deception, fraud and criminal acts on unsuspecting victims.

18

114.    This bond change would allow Dr. Durrani at CAST, Journey Lite and his
planned Dayton and Columbus locations to perpetuate his schemes on unsuspecting
victims. The relevancy again is to Dr. Durrani's wholesale lack of integrity and public
danger.

115.    In addition, the US Attorney filed a pleading in the criminal case indicating Dr.
Durrani failed to provide the required letter to a new unsuspecting victim.

116.    Dr. Durrani has asked the Court in his criminal case to allow him to travel to
Pakistan.

117.    Even upon and after being arrested, Dr. Durrani announced a new Spine Institute
by press release.

118.    Dr. Durrani's criminal indictment is attached as an exhibit to this complaint and
incorporated into this Complaint by reference pursuant to Ohio Rule 10(C).

119.    The above paragraphs demonstrate the mind set and modus operandi of a
diabolical, delusional, narcissistic and sadistic spine surgeon. Only a surgeon with these
qualities could perform unnecessary spine surgeries on unsuspecting, vulnerable patients.

120.    Dr. Durrani has nearly150 filed medical malpractice cases against him in Boone,
Butler and Hamilton Counties.

121.    Counsel for Plaintiffs has nearly 300 signed clients including those who are filed.

122.    Dr. Durrani, CAST, West Chester/UC Health, and JourneyLite of Cincinnati LLC
are Defendants and/or by their conduct tied to the following other litigation:

a.    Federal Civil Rico- 1:13 CV 202

b.    Federal Class Action- 1:13 CV 00301-TSB

c.    Hamilton County Class Action PureGen- A1305826

19

d.    Hamilton County Class Action Against Children's- A1305864

## ALLEGATIONS PERTAINING TO

## DR. DURRANI, CHILDREN'S, UC HEALTH, WEST CHESTER HOSPITAL

123.    Children's and UC Health share common financial funding, interests, goals,

information, credentialing, staff, physicians, offices, resources, business interests,

research, grants, and other common financial and structural components. This is

relevant as to the notice West Chester/UC Health had of Dr. Durrani's patient safety

risk prior to granting him privileges.

124.    Children's Hospital had a spine fellowship with UC Health and an academic

affiliation with UC Health.

125.    Dr. Durrani was the Director for a time of this spine fellowship. While at

Children's, Dr. Durrani did Spine Call at UC Health.

126.    When a new attending physician became privileged through Children's,

Children's would automatically go through the process to get them accredited and

credentialed at UC Health according to Dr. Durrani's own personal assistant for three

years he worked at Children's.

127.    UC Health had and has a resident program at Children's.

128.    UC Health Orthopedic residents did and do a six month rotation at Children's.

129.    Scott Hamlin was CFO at Children's from 1997 to 2012.

130.    James Anderson was CEO of Children's from 1996 to 2009.

131.    On the West Chester Application for privileges for 2008, the time Dr. Durrani

would have applied, there is what is called the Alliance Partners Central Verification

20

Office (CVO) "who provides centralized credentialing services for Health Alliance Hospitals."

132. The Health Alliance of Greater Cincinnati, Inc. is now known as UC Health, and is therefore a necessary and proper party to this litigation. They were involved in the credentialing and granting privileges to Dr. Durrani at West Chester.

133. The Health Alliance (UC Health) was a working partnership of independently owned hospitals.

134. Founded in 1994, The Health Alliance originally included Christ Hospital, St. Luke Hospital, Jewish Hospital, Fort Hamilton Hospital and University Hospital. Christ Hospital left the Health Alliance in 2007 and is now an independent entity. The St. Luke Hospitals left in 2008 to become part of St. Elizabeth Healthcare in Northern Kentucky.

135. Fort Hamilton Hospital left the Health Alliance to pursue negotiations to join Kettering Health Network. The Jewish Foundation completed the sale of Jewish Hospital in Kenwood to Mercy Health Partners. UC Health is now the sole member of the Alliance. UC Health now operates University Hospital, the region's only academic medical center, as well as West Chester Medical Center and the physician groups UC Physicians and Alliance Primary Care.

136. The Health Alliance, n/k/a UC Health continues be a joint venture partner in other entities, including the Lindner Center of Hope psychiatric facility and University Pointe Surgical Hospital. It provides services to University Hospital, West Chester Medical Center and Alliance Primary Care.

21

137.    Under no set of circumstances with the relationships the Health Alliance partners,
        UC Health, Children's, Christ had with Dr. Durrani going back years before Dr.
        Durrani's arrival at West Chester, owned and operated by UC Health, did West
        Chester/UC Health not have full knowledge of the patient safety risks Dr. Durrani
        brought with him.

138.    The Health Alliance n/k/a UC Health has a history of issues with Durrani like
        problems.

139.    On May 21, 2010, the Health Alliance of Greater Cincinnati n/k/a UC Health and
        the Christ Hospital agreed to pay $108 million for violating anti-kickback statute and
        defrauding Medicare and Medicaid.

140.    On November 24, 2008 Dr. Durrani authored a letter to his patients when he left
        Children's. This letter sets forth the members of the Orthopedic Group at Children's.
        These orthopedics have and had privileges at UC Health, as well as, Children's. This
        letter contains the University of Cincinnati logo at the top corner, evidence of a
        relationship between UC Health and Children's. This letter is also evidence that
        Children's knew Dr. Durrani was going to treat Children's patients who left to treat
        with Dr. Durrani.

141.    Brenda Farris was employed and trained by Cincinnati Children's Hospital during
        the same time Dr. Durrani was an employee of Children's.

142.    Prior to 2009, Brenda Farris worked at Children's Hospital as an employee of Tri-
        Health as a physician's assistant.

22

143.    Brenda Farris is a licensed orthopedic nurse practitioner, and while performing
        her duties in the Children's Orthopedic Clinic with Dr. Durrani, Nurse Farris
        witnessed Dr. Durrani alter medical records.

144.    Brenda Farris would review x-rays, examine the child, measure the scoliosis, and
        present the case to Dr. Durrani.

145.    In one case, Dr. Durrani changed her measurement of 28 degrees to 45 degrees so
        that a surgery would be required on a twelve year old child.

146.    Krissy Probst was Dr. Durrani's professional and personal assistant handling
        professional, academic, travel, surgery scheduling, his journals, his Boards, his
        credentialing, his personal affairs and his bills.

147.    Krissy Probst worked as Dr. Durrani's assistant for three years at Children's
        Hospital from 2006, 2007, and 2008.

148.    Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at
        Children's for his having an affair with Jamie Moor, his physician assistant.

149.    Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three
        other surgeons in the Orthopedic Department.

150.    Krissy Probst worked in the Orthopedic Department for eleven years from 2002-
        2013. She retired in May, 2013.

151.    Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

152.    According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated
        Dr. Durrani "like a son."

23

153.   According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

154.   Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

155.   Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

156.   At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

157.   Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

158.   Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

159.   Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

160.   Dr Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

161.   Dr. Durrani would schedule two to three spine surgeries a day at Children's.

162.   Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

24

163.    Dr. Durrani would leave a spine surgery patient for four or five hours in the
        surgery suite under the care of fellows or residents, unsupervised and sit in his office
        and check on the surgery as he pleased.

164.    Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's
        because he knew all about his patient safety risk issues. Yet, Dr. Stern supported,
        aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but
        was for one of the world's oldest motives—greed of money.

165.    There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use
        for Dr. Durrani.

166.    Dr. Durrani chose his own codes for Children's billing which he manipulated with
        the full knowledge of Children's Board and management.

167.    Dr. Duranni is now dating and living with Beth Garrett, a nursing school drop-out,
        with the full knowledge of his wife Shazia.

168.    Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie
        Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a
        long time.

169.    Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family
        paid for Dr. Durrani's education and it is her family with the significant wealth.

170.    Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or
        simply showing up at a spine conference.

171.    Krissy Probst's business director told her to save all Dr. Durrani related
        documents and information and she did.

25

172.    While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

173.    Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

174.    Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

175.    Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

176.    On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

177.    Defendants committed fraud by misrepresenting Dr. Durrani's reputation. Defendant knew he was doing unnecessary spine surgeries and concealing them from Plaintiffs. With the intent to mislead Plaintiffs, and knowing Plaintiffs would rely upon the misrepresentations and concealment, Defendant caused harm to Plaintiffs. Defendant knew their false information regarding Dr. Durrani was material to Plaintiffs decision making in choosing Dr. Durrani as a surgeon, allowing him to perform surgery, following his recommendation and being trusting to have their procedures at Defendant hospitals.

178.    Dr. Durrani's CAST website states in part: "The entire focus at CAST is on the patient. From the ease in getting in to see a physician…to wellness, therapy and treatment programs that can help patients avoid surgery…to minimally invasive

26

techniques if surgery is necessary...to our remarkable facility and one-site convenience. It's time patients have the level of preventive care and advanced treatment we offer. Atiq Durrani, MD- Founder of CAST." As shown and will be shown, this is a material misrepresentation which is false relied upon by Dr. Durrani's patients including Plaintiffs to allow Dr. Durrani to perform unnecessary surgeries on Plaintiffs.

179. Gerry Goodman worked under a Corporate Integrity Agreement in 2010 at West Chester/UC Health.

180. Gerry Goodman, from August to November 2010, while serving as the interim director of OR nursing at West Chester Medical Center, complained to administration including Mitch McCrate about Dr. Durrani's deviations and violations of law, policies, bylaws, rules and regulations which were effecting patient care, including Plaintiffs.

181. Mitch McCrate told Gerry Goodman West Chester/UC Health wasn't concerned because "the hospital had state funding and therefore was not held to qui tam rules."

182. Gerry Goodman told Mitch McCrate, General Counsel; Jack Talbot, HR; George Caralis, COO and Kevin Joseph, MD, President; that Dr. Durrani had a "partner" who had not received provider status and Dr. Durrani was billing his "partner" under Dr. Durrani's provider number, something which was illegal.

183. The "partner" was Dr. Shanti.

184. Dr. Durrani and Dr. Shanti would do three or four cases simultaneously and bill them simultaneously.

185. Gerry Goodman told McCrate, Talbot, Caralis and Joseph she could not work in a place which condones illegal practices. They asked her to ignore them. She refused.

27

186.    Dr. Durrani, according to Gerry Goodman, did whatever he wanted in the OR and knew he could get away with it including being treated like a king by the vendors.

187.    Vendors such as Medtronic representatives were allowed in the OR after going through the preapproved process they must go through. David Rattigan, Dr. Durrani's primary vendor, worked at Bahler peddling Medtronic products.

188.    Dr. Durrani was abusive to his and West Chester/UC Health staff. This was tolerated by West Chester/UC Health and effected patient care including that of Plaintiffs.

189.    Dr. Durrani never cared about others schedules or the West Chester/UC Health OR schedule.

190.    Dr. Durrani declared every surgery an emergency to ignore schedules.

191.    Dr. Durrani received two full days and two half days of block time at West Chester/UC Health. It was never enough time for his over utilization.

192.    When Gerry Goodman would say no to a Dr. Durrani scheduling request, Dr. Durrani would contact West Chester/UC Health administration and she would be overridden.

193.    Gerry Goodman had skill, knowledge and experience to recognize a "Dr. Durrani" because she had been involved in the outing of another over-utilizer and unnecessary procedure surgeon performing cardiac catherizations.

194.    Spine surgeons usually do one or two a day, possibly three surgeries a day if an emergency.

195.    Dr. Durrani would often do four, five and even six surgeries.

28

196. Dr. Durrani and Dr. Shanti would walk from surgical room to surgical room with all the spine patients "open" for an extended time past the standards of care.

197. On at least two occasions, Dr. Durrani patients were open for in excess of a hour waiting for him to come into the case.

198. When Gerry Goodman would complain to Dr. Durrani about patients being anesthezed and the operative site open for long periods of time, Dr. Durrani would claim "we are covering anesthesia with antibiotics."

199. When Dr. Durrani performed with Dr. Shanti these multiple simultaneous procedures, they were billed as if he was the attending surgeon in all three surgeries.

200. The Dr. Shanti and Dr. Durrani "open and switch" to do the surgery, we have labeled the "Shanti Shuffle."

201. The Shanti Shuffle is not the normal. Shanti did not assist, he replaced.

202. Gerry Goodman complained to risk management repeatedly to no avail of the Shanti Shuffle.

203. When Gerry Goodman pointed out to risk management, Jill Stegman and David Schwallie that Dr. Durrani had all the "red flags" from over utilization and being bounced out of other area hospitals, they responded "how did you know." Gerry Goodman knew because anyone in hospital administration and management in the tri-state in 2008 to 2013 knew. Dr. Durrani was no secret.

204. Jill Stegman and David Schwallie admitted to Gerry Goodman they knew about Dr, Durrani's over utilization, being "bounced out" of other hospitals and all the issues going on with him with the OR, but West Chester needed Dr. Durrani's numbers.

29

205. When Gerry Goodman complained to George Caralis about Dr. Durrani, he told Gerry Goodman to "keep your mouth shut and go back to work because you are just an interim."

206. George Caralis told Gerry Goodman that West Chester/UC Health needed Dr. Durrani surgeries and admissions and therefore they were not going to stop him.

207. Jill Stegman and David Schwallie informed Gerry Goodman they would get back with her about Dr. Durrani in a few days. They never did.

208. After Gerry Goodman was blown off by David Schwallie and Jill Stegman, she decided to leave her work assignment at West Chester/UC Health.

209. Gerry Goodman checked the written consents of BMP-2 patients including Plaintiffs which Dr. Durrani, CAST and West Chester/UC Health had them sign and confirmed they did not provide consent to BMP-2.

210. Gerry Goodman reported on the lack of consent for BMP-2 also to Scwallie, Stegman, Joseph, Caralis, Talbot and McCrate and they ignored her.

211. Gerry Goodman verified there was nothing in the patients' charts, including Plaintiffs' charts, reflecting they were informed of the risks of off label use of BMP-2.

212. Upon hearing her repeated complaints about Dr. Durrani, George Caralis told Gerry Goodman she was just an "emotional female."

213. Gerry Goodman reported to no avail patient safety issues caused by the OR staff working from 7 AM to midnight on Dr. Durrani patients. Fatigue caused deviations in standard of care by West Chester/UC Health staff's including in Plaintiffs.

214. No action was taken by West Chester/UC Health's board or management to correct the informed consent issue on BMP-2. The time period of Gerry Goodman's

30

warning and complaints were fall 2010. Plaintiffs' claims arise from January 1, 2009 through May 2013. At least, according to Gerry Goodman's interim service, any Plaintiff having BMP-2 placed after the fall of 2010 at West Chester/UC Health is a further tragedy because the Board, administration and management can't obey notice and they allowed Dr. Durrani to continue placing BMP-2 at will. Why? Money. Despite having full knowledge of the issue, West Chester/UC Health's board and management allowed patients including Plaintiffs to have BMP-2 placed in them by Dr. Durrani at their facility without warning them, with full knowledge they were not warned.

215.     Gerry Goodman knew anesthesia charged per the minute or in fifteen minute increments and she considered it a fraud to bill for unnecessary anesthesia when patients were "open" longer than necessary.

216.     Dr. Durrani would contact Medtronics and other vendors directly, they would bring into the OR what Dr. Durrani requested and then invoice West Chester/UC Health.

217.     During surgeries, Medtronics and other vendors would want to up sell products.

218.     This process was distracting to the OR staff and affected patient care.

219.     Dr. Durrani told Gerry Goodman Dr. Shanti had privileges, but wasn't yet on all the insurance panels.

220.     Gerry Goodman asked Dr. Durrani: "Which panel so he's not doing those cases?"

221.     Dr. Durrani told Gerry Goodman in response: "We're doing these procedures together. They're billed under my name."

222.     Gerry Goodman witnessed one case where Dr. Durrani was never in the room at all, just Dr. Shanti. Yet, Dr. Durrani claimed the procedure.

31

223.    Gerry Goodman confronted Dr. Shanti and he simply stated: "Dr. Durrani and I are co-surgeons."

224.    Gerry Goodman verified Dr. Shanti was not on the written informed consents for these procedures.

225.    Kevin Joseph, MD, and President of West Chester Medical Center, knew everything Gerry Goodman complained about because either she told him or George Caralis told him. Caralis told her he told him.

226.    Dr. Durrani had no supervision at all at West Chester/UC Health.

227.    When Gerry Goodman attempted to supervise him, the West Chester/UC Health management as described here rebuked her.

228.    Gerry Goodman also informed Mitch McCrate, Jill Stegman, David Schwallie, George Caralis and Kevin Joseph, MD, that Dr. Durrani's high volume of fusions of the spine was not usual practice. They ignored these concerns.

229.    West Chester/UC Health's board and management, did not provide proper supervision of Dr. Durrani as required through the surgery and orthopedic departments. (See Bylaws section to follow)

230.    Gerry Goodman also spoke to the Chief of Surgery at West Chester Medical Center about Dr. Durrani to no avail.

231.    The West Chester/UC Health manager who did analytics and kept records sent to Gerry Goodman at her request, months' worth of their BMP tracking. She kept it and still has it.

32

232.     West Chester/UC Health has previously denied tracking BMP-2. They lied. They tracked it to analyze the profit. They liked the profit. They encouraged Dr. Durrani to place all the BMP-2 he could.

233.     Based upon Gerry Goodman's documentation, Plaintiffs have requested and expect to receive all BMP-2 tracking as evidence of Plaintiffs BMP-2 claims.

234.     West Chester/UC Health's board and management, increased the cost of the surgeries of Plaintiffs and patients by using BMP-2 infuse.

235.     Dr. Durrani would also sign operative reports he never dictated with the full knowledge of West Chester/UC Health's board and management. This is yet another practice Gerry Goodman complained about.

236.     Dr. Shanti dictated operative reports he never signed with the full knowledge of West Chester/UC Health's board and management. They knew because Gerry Goodman complained.

237.     Orthopedics and spine surgeries are some of the highest sources of income for a hospital and were too for West Chester/UC Health.

238.     In the spring of 2013, Dr. Peter Stern told Dr. Angelo Collissimo, UC Orthopedic Surgeon, that West Chester/UC Health "knew all about Dr. Durrani's issues before he came to us and after he came to us, but we needed the money."

239.     The billings for Dr. Durrani surgeries were sent to Plaintiffs at their homes with requests for payment.

240.     Plaintiffs were required to make payments of uncovered medical bills to Dr. Durrani and CAST.

33

241. Dr. Durrani produced, distributed and utilized a video of a lecture involving his EDS patients to solicit more patients.

242. Unbeknownst to his EDS patients, Dr. Durrani was doing experiments on these EDS patients including many of the Plaintiffs without informing them they were part of an experiment. This too violated West Chester Medical Staff Bylaws as revealed in a later section.

243. Dr. Durrani claims in his EDS video a 95% success rate with the C1-C2 operations and only one of the twenty-five claimed they would not have the surgery again.

244. The undersigned counsel represents 20 of these 25 persons and not one would have the surgery again. They are Plaintiffs.

245. Dr. Tayeb was an employee of Dr. Durrani from 2009 to 2013. Counsel has interviewed him extensively.

246. Dr. Tayeb will testify that Dr. Durrani improperly selected patients for surgery, and then recommended surgery, including patients with EDS that were not proper candidates for surgery including many of the Plaintiffs.

247. Dr. Tayeb will testify that improper business practices occurred at CAST, including Dr. Durrani recommending surgeries that were medically unnecessary including the Plaintiffs.

248. Dr. Tayeb will testify that Dr. Durrani made decisions to place wealth and status over the well-being of his patients including Plaintiffs.

249. Dr. Tayeb, Dr. Durrani's pain management doctor for a time at CAST, reports that Dr. Durrani's misuse of BMP-2 resulted in bony overgrowth, where "it's like a big

34

block of bone back there where you can't even stick a needle there anymore" and patients, including Plaintiffs would develop neuropathic pain.

250.    Dr. Tayeb could not reach the nerve in many of the BMP-2 patients to even treat with injections.

251.    Dr. Tayeb would engage Dr. Durrani in shouting matches at CAST over patient care that others witnessed.

252.    Elizabeth Dean was employed at West Chester Medical Center before they opened the doors for business.

253.    Elizabeth Dean was one of the original patient access representatives at West Chester Medical Center, which is now West Chester Hospital, beginning employment in February 2008 to July 2010.

254.    Elizabeth Dean had many responsibilities within the hospital including admitting Dr. Durrani patients and completing financial reports for the West Chester/UC Health CFO, Mike Jeffers.

255.    Elizabeth Dean was also included in most corporate meetings where discussions took place over the mass injections performed by Dr. Durrani in the testing area of the hospital and she also was the actual patient access representative who registered and spoke with all the Durrani patients.

256.    According to Elizabeth Dean, before Dr. Durrani began to practice at West Chester Hospital, every area of the hospital was a "ghost town."

257.    Despite being a new hospital, it was still not picking up revenue as it expected.

258.    Elizabeth Dean was required to ask for all copays when the patients arrived, just to "keep the numbers up" as much as possible.

35

259. Elizabeth worked for five years as a medical biller with University Internal Medicine Associates before coming to West Chester.

260. Elizabeth Dean knew West Chester/UC Health needed money based upon her position and work at West Chester.

261. Elizabeth Dean reviewed the final numbers from CFO Mike Jeffers each month and also logged all payments received on the surgery cases including Dr. Durrani's.

262. West Chester/UC Health's board and management gave staff raises based upon the hospitals financial woes.

263. West Chester/UC Health fired the original CEO and corporate employees once the hospital was bought by UC Health, and appointed an ER physician as the new CEO, Kevin Joseph, MD.

264. Elizabeth Dean will testify that West Chester/UC Health decided to have West Chester/UC Health ran by physicians.

265. Vickie Scott worked at West Chester in the operating room during the time Dr. Durrani also worked there.

266. OR Nurses, including Vickie Scott, went to the OR management, Elaine Sreinko and Denise Evans and to Risk Management, Jill Stegman, about Durrani's illegal activities, deviations in standard of care and violations of policies, bylaws, regulations and rules. No action was taken. They complained and reported the same issues Gerry Goodman reported as previously described.

267. Vickie Scott informed Elaine Sreinko, OR assistant manager, about Dr. Durrani making the records appear that Dr. Durrani was doing all the procedures when they knew it was Dr. Shanti. Sreinko did nothing to stop the Shanti Shuffle.

36

268.     Scott Rimer, circulating nurse at West Chester Medical Center, spoke up and
complained about Dr. Durrani at an OR meeting with OR staff and hospital
administration. Not only was Scott Rimer ignored, the next day he had his supervisor
standing next to him watching his every move. He was fired soon after.

269.     In summary, Gerry Goodman, Vickie Scott, Scott Rimer and other OR staff
members complaints to management included the number of Dr. Durrani surgeries he did
a day and at a time; other surgeons performing surgeries for him without proper consent;
Dr. Shanti not having proper qualifications and provider numbers; BMP-2 was tracked by
the hospital despite their denials of doing so; Dr. Durrani was verbally abusive to
everyone; anesthesiologists had to have patients "under" longer than they should have
been; off label use of BMP-2 was not covered by informed consent; Medtronic reps
would "up-sale" during surgeries; operative reports were not timely completed; Dr.
Durrani had no supervision by the hospital; keeping OR staff past the time it was safe.

270.     Those Gerry Goodman, Vickie Scott, Scott Rimer and other OR staff members
complained to included Mitch McCrate, Jack Talbot, George Caralis, Kevin Joseph, MD,
Melissa Hemmer, Elaine Sreinko, Denise Evans, Jill Stegman, David Schwallie. All of
these individuals are and/or were West Chester/UC Health management who
communicated these complaints to the board. Many like Kevin Joseph, MD, President
were on the board.

271.     West Chester/UC Health, its board and management, also knew of Dr. Durrani's
sexual harassment of OR nurses and staff and ignored it.

272.     Melissa Dowler witnessed Dr. Durrani offer a nurse in the OR $10,000 for oral
sex.

37

273. Dr. Durrani had an affair with his staff member, Beth Garrett, who dropped out of nursing school, and like his relationship with a prior physician assistant at Children's Hospital, Jamie Moor it affected patient care.

274. Dr. Durrani, by his deposition testimony, admits he relies upon his own reading of radiology. Of course, in this manner he would recommend a surgery the radiology did not support. The radiology department at West Chester, the director of radiology and all the radiologists privileged at West Chester from January 1, 2009 to June 1, 2013, knew Dr. Durrani was ignoring their radiology interpretations and did nothing to address the issue and/or were ignored when they tried to address the issue.

275. Dr. Durrani, by his deposition testimony, admits he informs the pain doctor where to inject medicine. By doing so in the wrong place, he convinced many Plaintiffs to have repeat surgeries.

276. Melissa Garrett is forty-one (41) years old, and is a pharmaceutical salesperson in Tampa, Florida. Melissa Garrett said her sister Elizabeth "Beth" Garrett who currently worked for Durrani/CAST.

277. Melissa Garrett contacted counsel and stated that Beth Garrett was holding herself out as a nurse, although Beth Garrett had failed out of nursing school.

278. Melissa Garrett stated that Beth Garrett had been present during surgeries by Dr. Durrani.

279. She stated that Beth Garrett had improperly assisted in surgical procedures performed by Dr. Durrani without a nursing license.

280. She stated that Beth Garrett had been improperly selling pharmaceutical products, without a license.

38

281.    She stated that Beth Garrett was having an "affair" with Dr. Durrani, and that she
        was concerned after Beth Garrett brought Dr. Durrani to her son's elementary school
        function and that the family "freaked out" in response to Beth Garrett and Dr.
        Durrani's conduct during the school function.

282.    Dr. Durrani prescribes a custom compound cream he sells to patients without
        informing them which he bills to their insurance and just sends to them.

283.    On information and belief Dr. Durrani owns some interest in this compound
        cream in a physician owned distributorship (POD) arrangement.

284.    Shauna O'Neal followed Gerry Goodman to West Chester as Director of Nursing.

285.    Shauna O'Neal came from Compass Clinical Consulting group in Cincinnati.

286.    Shauna O'Neal wrote a letter to Tom Daskalakis the COO of West Chester/UC
        Health, Kevin Joseph, MD, and the CNO in which in which she reiterated what Gerry
        Goodman reported regarding Dr. Durrani's OR bookings and Dr. Shanti's lack of
        credentials and/or privileges. She was ignored.

287.    Thomas Kunkel, MD, anesthesiologist, complained to West Chester/UC Health's
        board and management about Dr. Durrani's high number of "add on" patients. He
        was ignored.

288.    According to Gerry Goodman, Dr. Durrani did add on patients at the last minute
and after regular business hours so there was no one to preauthorize patients or question
Durrani in any way regarding the surgery.

289.    Dr. Durrani always told Thomas Kunkel, MD the surgeries were emergencies.

290.    At times anesthesiology demanded the Chief of Surgery to intercede to judge
whether or not it was emergent.

39

291.   Cindy Traficant was Periop Director before and after West Chester opened.

292.   When UC Health took over, Julie Holt, the original CNO, quit.

293.   Cindy Traficant became interim CNO.

294.   Cindy Traficant had a reputation of tolerating "bad" physicians.

295.   West Chester Surgery was nicknamed by staff at West Chester/UC Health the "island of misfit" doctors because they took in and tolerated any doctor no matter their ethics, including Dr. Durrani.

296.   OR staff collectively reported Dr. Durrani issues to West Chester/UC Health board and management and their complaints were ignored.

297.   Dr. Durrani would sometimes, because he was running behind, cancel part of a surgery or do only part of the surgery, thus requiring the patient to have another surgery, all without informing the patient the cancellation was because he was late.

298.   Dr. Durrani performed 159 surgeries at West Chester Medical Center in 2009; 534 in 2010; 536 in 2011; 437 in 2012; and 157 in 2013 for a total of 1,823 surgeries.

299.   West Chester/UC Health admitted in a discovery answer in the Shell case that for the investigation, background check and the information used to decide to grant Dr. Durrani privileges they relied upon in part:

     A. Dr. Durrani's education.

     B. Dr. Durrani's training and experience.

     C. Copies of his licenses and DEA numbers.

     D. Inquiry to the National Practitioners Data Bank.

     E. Evidence of required continued education.

40

300. West Chester/UC Health refuses to provide under a claim of privilege all persons they consulted prior to permitting Dr. Durrani privileges.

301. Dr. Durrani total **surgeries** performed as answered in a discovery in Shell at West Chester is as follows:

2009: 665

2010: 1908

2011: 1736

2012: 1102 (Through 9/30/12)

302. Dr. Durrani admitted as **inpatient** based as answered in a discovery answer in Shell at West Chester is as follows:

2009: 154

2010: 488

2011: 507

2012: 305 (Through 9/30/12)

303. Dr. Durrani admitted as outpatients based as answered in a discovery answer in Shell at West Chester is as follows:

2009: 13

2010: 41

2011: 45

2012: 35 (Through 9/30/12)

304. West Chester/UC Health refuses to provide under a claim of privilege their investigation to determine Dr. Durrani's fitness to practice medicine prior to permitting Dr. Durrani privileges.

41

305.    West Chester/UC Health refuses to provide under claim of privileges, the
instances where Dr. Durrani did not follow proper medical documentation protocol,
policies and/or procedures at West Chester/UC Health.

306.    West Chester/UC Health refuses to provide under claim of privileges, the
complaints made by employees, staff or patients related to Dr. Durrani.

## BMP-2

## (These Factual Allegations Apply to All Defendants)

307.    Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries, if this
case involves BMP-2, this is noted within this Plaintiff's specific factual allegations
addressed earlier in this Complaint.

308.    Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for
BMP-2, the substance also referred to as infuse, which is a bone morphogenic protein,
used as an artificial substitute for bone grafting in spine surgeries.

309.    Dr. Durrani used BMP-2 in surgeries in Plaintiffs in manners not approved by
Medtronic.

310.    According to Dr. Durrani's own deposition testimony in several of Plaintiffs
cases, Medtronic required one of their representatives in the operating room when their
products, including BMP-2 is used.

311.    Therefore, Medtronic knew when Dr. Durrani used BMP-2 outside the approved
uses according to Medtronic's own guidelines.

312.    Plaintiffs were not informed by Dr. Durrani and CAST staff or employees of Dr.
Durrani used BMP-2 by Dr. Durrani in their surgery.

42

313.   Plaintiffs would have never allowed BMP-2 to be used by Dr. Durrani in their bodies in a manner which Medtronic specifically stated it should not be used based upon the risks including the increased risk of cancer.

314.   Plaintiffs would not have consented to the use of BMP-2 in their bodies if informed of the risks by Dr. Durrani and CAST, its board, management, staff or employees.

315.   Dr. Durrani and CAST and its board, management, staff or employees intentionally did not disclose the use of BMP-2 to Plaintiffs so Dr. Durrani and CAST could profit from BMP-2 sales.

316.   Every single written informed consent of Dr. Durrani and CAST signed by Plaintiffs lacked the disclosure of BMP-2 and furthermore not a single Plaintiff ever received a verbal disclosure of BMP from Dr. Durrani and CAST management, staff or employees.

317.   Dr. Durrani was encouraged by Medtronic to obtain peer reviewed and published studies from Medtronic sales representatives to support his use of BMP-2.

318.   Dr. Durrani was encouraged by Medtronic to be an "advocate" for his patients, including Plaintiffs and describe how BMP-2 technology can benefit them.

319.   Medtronic specifically required BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.  Dr. Durrani used BMP-2 in children, including some of the Plaintiffs, with the full knowledge of all Defendants.

320.   Medtronic specifically required BMP-2 only be used in the spine at One level-L2- Sl. Dr. Durrani used BMP-2 in all levels of the spine, including some of the Plaintiffs with full knowledge of all Defendants.

43

321.   Medtronic only allowed BMP-2 for Grade 1 spondylotisthesis Grade 1 retrolisthesis (at involved level). Dr. Durrani with full knowledge of the Defendants ignored this requirement including some of the Plaintiffs.

322.   Medtronic required at least six months of non-operative treatment prior to use of BMP-2. Dr. Durrani used BMP-2 without this six month non-operative treatment with the full knowledge of the Defendants in most of the Plaintiffs.

323.   Medtronic required BMP-2 always be used in conjunction with a cage. Dr. Durrani used BMP-2 with and without a cage with the full knowledge of the Defendants including in some of the Plaintiffs.

324.   All Defendants have billed and accepted private insurance, Medicare and Medicaid payments for these known surgeries which should have never taken place including Plaintiffs'.

325.   Medicare informed providers "Medicare does not cover lumbar interbody spinal fusions in an outpatient setting" so Dr. Durrani with full knowledge, participation and cooperation of Defendants performed them as inpatient.

326.   Medtronic required a "carrier scaffold" to be used together with BMP-2. Dr. Durrani did not do so with the full knowledge of the Defendants in many of the Plaintiffs.

327.   Medtronic refers medical providers to see the package insert of BMP-2 for the complete list of indications, warnings, precautions, adverse events, clinical results and other important medical information. Dr. Durrani and the Defendants did not inform the Plaintiffs of this information.

328.   Medtronic states relative to BMP-2: "Caution: Federal (USA) law restricts this device to sale by or on the order of a physician with appropriate training or experience."

44

CAST, its board and management, knew Dr. Durrani was never properly trained and he misused BMP-2. Yet, they continued to allow Dr. Durrani to use it.

329. In addition to those with BMP-2, Dr. Durrani, with the full consent, knowledge and support of the other Defendants also misused in Plaintiffs screws and other hardware manufactured by Medtronic, including Plaintiffs.

330. In addition, Dr. Durrani, with the full consent, knowledge and support of the other Defendants, their management and boards, ignored radiograph findings, other diagnostic tests and physical findings to perform unnecessary spine surgeries, including in Plaintiffs.

331. FDA required the Defendants to report all adverse circumstances pertaining to Dr. Durrani patients and they have failed to do so, including Plaintiffs.

332. Despite having full knowledge of Dr. Durrani's patient care issues prior to granting him privileges and despite having full knowledge of the factual allegations against him and despite full knowledge spine doctors throughout the tri-state are representing pre-Durrani surgery radiology did not support Plaintiffs' spine surgeries, and despite full knowledge of Dr. Durrani's misuse of BMP-2 and other Medtronic products, Defendants took no action against Dr. Durrani and continued to allow him to perform surgeries at Defendants with full knowledge those who he performed surgery on may not need the surgery; may have BMP-2 and other hardware used upon them without their consent; may be subjected to Dr. Durrani's failure to perform the surgery properly and their spines injured beyond repair with their present and future health jeopardized.

333. Defendants were required to protect their patient's, including Plaintiffs, against false or fraudulent treatment by Dr. Durrani.

45

334.    Dr. Durrani routinely falsified his diagnoses and deceived his patients through omission of risks to perform surgeries that were unnecessary, not medically indicated, and/or experimental for the purpose of obtaining payment from third parties including insurers and Medtronic with the full knowledge of the Defendants.

335.    Dr. Durrani was a paid consultant for Medtronic and also a physician owned distributor or what is called a POD.

336.    Dr. Durrani never informed Plaintiffs that Dr. Durrani was a consultant for Medtronic and that Dr. Durrani received substantial financial compensation from Medtronic.

337.    Dr. Durrani in deposition testimony in related cases admitted under oath he never informs a patient, including Plaintiffs, of his Medtronic relationship.

338.    Unnecessary procedures are criminal acts. Defendants collectively performed medically unnecessary, experimental spine surgeries on Plaintiffs using falsely and improperly marketed Medtronic medical devices and drugs.

339.    During these unnecessary spine surgeries Defendant Durrani implanted cervical and thoracic rods, screws and cages ("hardware") into Plaintiffs and used a drug called Infuse/BMP-2 ("BMP-2").

340.    BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse." BMP-2 is not approved by the Food and Drug Administration for use on the cervical and thoracic spine. (See FDA Public Health Notification: Life Threatening Complications Associated with Recombinant Bone Morphogenetic Protein (BMP-2) in Cervical Spine Fusion, July 1, 2008.

46

341. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age. (See Medtronic product package warnings, INFUSE/BMP-2.)

342. Medtronic improperly marketed and influenced research related to the safety and efficacy of Infuse/BMP-2 both before and after the release of BMP-2 into the marketplace. (See United States Senate Committee on Finance, Staff Report on Medtronic's Influence on Infuse Clinical Studies, October 2012 S. Prt. 112-8.)

343. Dr. Durrani and CAST knowingly and falsely marketed BMP-2 to Plaintiffs as safe and approved for use in Plaintiffs' cervical and thoracic spine surgeries. Defendants Durrani and CAST knowingly misled Plaintiffs concerning BMP-2 used in Plaintiff's cervical and thoracic spine surgeries.

344. Defendants Durrani and CAST knowingly and falsely misled the government by stating a) the surgeries on were medically necessary and b) that the Defendants had obtained proper informed consent of the Plaintiffs to use the hardware and BMP-2 on Plaintiffs.

345. The hardware and BMP-2 was manufactured by Medtronic by Defendants CAST and Durrani and distributed by Durrani. All Defendants improperly profited from false claims paid by the government and private insurance.

346. Defendant Durrani holds the patent to the hardware and sold the rights to the hardware to Medtronic. Defendant Durrani is a paid consultant for Defendant Medtronic.

347. Medtronic paid Durrani consulting fees and other royalties in consideration for using the hardware and BMP-2 in surgeries in Plaintiffs. Furthermore, and Durrani receives improper payments and "kickbacks" when he experimentally used the drug BMP-2 and the hardware on Plaintiffs and other unsuspecting patients.

47

348.    In summary, through the joint and several acts and omissions of these Defendants,

Plaintiffs became unsuspecting experiments for real world testing of Medtronic hardware

and BMP-2, by and through Durrani and CAST who had secret financial connections to

Medtronic, improper financial motives, and submitted false claims. The government paid

for these improper and unregulated experiments as a result of false claims made by the

Defendants under the veil of "medically necessary" surgeries.

349.    Medtronic paid for Yale University to complete a study on BMP-2's usefulness

and benefits. The study, completed in 2013, concluded BMP-2 offers no benefit to

patients.

350.    The Wall Street Journal reported on June 18, 2013 the following: Studies Fail to

Back Medtronic Spine Product: "Two independent studies found Medtronic Inc. bone-

growth product for spine surgeries was no better than a traditional operation. The studies

were the result of a two year experiment in lifting the veil on industry sponsored trial

data. The product, called infuse, has been plagued by allegations that doctors who wrote

key studies backing the technology received millions of dollars in royalties and fees

related to other work and may have understated risks. The company took the unusual

step of handing over detailed trial data on Infuse to a team of Yale University experts,

along with $2.5 million grant. Yale hired outside researchers to analyze the data. Overall

complication rates for the back-pain surgeries were similar regardless of whether Infuse

was used, according to the studies published in the Annals of Internal Medicine. One of

the studies, by Oregon Health and Science University researchers, linked Infuse to

increased cancer rates after two years. But cancer risks remain small, the researchers

said, and the other study, by researchers at the University of York in the U.K. didn't

48

detect a cancer link. "We found the product offered no additional benefits" of the spine

surgery, said Rongwei Fu, the Oregon study's lead author. Coupled with the increased

cancer risk, the study said, it was difficult to identify "clear indications" for using the

product. "We found a lot of reporting bias in Medtronic's published papers that tends to

overstate the benefits and played down the risks," Dr. Fu said, citing for example, failing

to include certain complications."

351.    Dave Rattigan, Dr. Durrani's main Medtronic Representative from Bahler, is

actively fighting a subpoena to give a deposition in these cases.

352.    The lawyer David Rattigan is using is the same lawyer as Medtronic.

353.    Despite willingness to cooperate in scheduling the date, they refuse.

## VIOLATIONS OF FEDERAL & STATE LAW

354.    The Defendants engaged in a common scheme involving civil conspiracy, fraud,

material misrepresentation, deceit, and extreme and outrageous conduct intentionally

directed at each of the patients. In furtherance of their scheme to defraud, the

Defendants have violated and/or caused others to violate several statutes, regulations,

and other state and Federal legal requirements including but not limited to:

e.      Ohio Product Liability Act, RC. 2307.71-2307.80;

f.      42 C.F.R. §482.13, codifying the Patient's Right to Informed Consent;

g.      42 C.F.R. §482.51, covering the informed consent of surgical patients;

h.      45 C.F.R. Part 46, et seq., specifically 45 C.F.R. §46.122, covering the conducting

of medical research on human subjects with the support of federal funds, known as the

"Common Rule";

i.      18 U.S.C. §1035, covering the criminal act of making "False Statements Relating

49

to Health Care Matters" involving any health care benefit program, public or private;

j.      18 U.S.C. §1347 of the Criminal Code covering "Health Care Fraud" involving any health care benefit program, public or private;

k.      18 U.S.C. §§ 1341, 1343, 1956, 1957, and 2314 covering "Mail Fraud", "Wire Fraud", "Money Laundering", "Use of Dirty Money", and "Travel to Effect the Scheme", to effectuate the fraudulent scheme; and

l.      The violation of the warning letter from the FDA dated June 23, 2011 warning against promoting and marketing PureGen without FDA approval; and for violating the Food Drug and Cosmetic Act, 21 U.S.C. § 351, et seq., by marketing a device without premarket approval, 510k clearance, meeting the humanitarian device exception, exemption from the Act, or other qualification to market the device; for violating the Public Health Service Act 42 U.S.C. §201, et seq., specifically § 262(a) and (i), and related federal regulations, specifically 21 C.F.R. 1271.10(a)(4)(ii)(b); for violating the Food Drug and Cosmetic Act 21 U.S.C. §351, et seq., specifically § 355(a) and (i), and 21 C.F.R. 312; and the Public Health Service Act 42 U.S.C. 262, specifically § 262(a) and (i).

355.    Beginning in approximately 2005 and continuing through the present, Dr. Durrani derived significant profits by convincing patients, including Plaintiffs, to undergo medically unnecessary spinal surgeries and by billing private and public healthcare benefit programs for their fraudulent services.

356.    Dr. Durrani performed unnecessary spine surgeries on Plaintiffs and this proximately caused serious bodily injury and/or harm to Plaintiffs.

50

357.    Dr. Durrani, convinced Plaintiffs with false representations that surgery was their only option, when in fact the patient did not need surgery.

358.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs' medical situations were urgent and required immediate surgery.

359.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs were at risk of grave injuries without the surgery Dr. Durrani recommended.

360.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs risked paralysis or their head would fall off if the Plaintiffs were in a car accident.

361.    Dr. Durrani did not read or ignored the radiology reports written by the radiologists for imaging studies that Dr. Durrani ordered on Plaintiffs including x-rays, CAT scans and MRIs and failed to disclose this to Plaintiffs.

362.    Dr. Durrani convinced Plaintiffs with false representations that Plaintiffs based upon Dr. Durrani's own exaggerated and dire reading of the patient's imaging that was either inconsistent with or plainly contradicted by the report written from the radiologist, that Plaintiffs needed surgery.

363.    Dr. Durrani provided a false reading to Plaintiffs of their pre-surgical imaging.

364.    Dr. Durrani dictated he had performed certain physical examinations and procedures on Plaintiffs that he did not actually perform.

365.    Dr. Durrani ordered a pain injection for a level of the Plaintiffs' spine that was inconsistent with the pain stated by the Plaintiffs or the imaging.

366.    Dr. Durrani scheduled Plaintiffs for surgeries without learning or waiting for the results of certain pain injections or related therapies on Plaintiffs.

51

367.    Dr. Durrani dictated Plaintiffs' operative reports or other Plaintiffs' records months after the actual treatment.

368.    Dr. Durrani placed in Plaintiffs' operative reports and treatment records false statements about the diagnosis for the Plaintiffs, the procedures performed, and the instrumentation used in the procedure.

369.    Dr. Durrani failed to inform the Plaintiffs of or misrepresented the nature of the complications they experienced as a result of the surgeries he performed on Plaintiffs.

370.    Dr. Durrani made false statements to colleagues about the success of Plaintiffs' surgeries.

371.    Dr. Durrani made false statements to Plaintiffs about why a surgery would not be performed at a certain hospital.

372.    Dr. Durrani made false statements to Plaintiffs regarding why he no longer practiced at certain hospitals.

373.    Plaintiffs were left in a worse financial and medical condition and position due the unnecessary surgeries Dr. Durrani performed.

374.    Dr. Durrani knowingly and willfully executed and attempted to execute their scheme and artifice to defraud, obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of health care benefit programs as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of, billing, and payment for health care benefits, items, and services including to Plaintiffs.

375.    Peter Stern, MD, President and/or Chief of Staff (at one time) of West Chester Medical Center (West Chester/UC Health) knew Dr. Durrani was a patient safety issue,

52

but West Chester Medical Center was in such financial trouble West Chester/UC Health "looked the other way."

376.    On May 16, 2013, it was publicly announced in Cincinnati newspapers Jim Kingsbury was stepping down as CEO of UC Health.

377.    Jim Kingsbury in 2008 left the Health Alliance and UC Medical Center to help establish a hospital in Dubai which also involved Dr. Durrani.

378.    In 2010, Jim Kingsbury was rehired by UC Health (formerly known as the Health Alliance).

379.    Jim Kingsbury's favorable relationship with Dr. Durrani aided Dr. Durrani being allowed to maintain privileges at West Chester Medical Center despite Mr. Kingsbury's and West Chester/UC Health's, board and management knowledge of all which has been alleged in this Complaint.

380.    During the time Dr. Durrani was an employee at Children's, he had privileges at Christ Hospital and UC.  UC Health knew about Dr. Durrani's issues all the way back in 2003 to 2008.

## VIOLATIONS OF THE SAFE MEDICAL DEVICE ACT

381.    The Safe Medical Devices Act ("SMDA") of 1990 (Public Law 101-629) is a federal law that became effective November 28, 1991.

382.    The SMDA mandates all facilities that use medical devices (referred to as device user facilities), which includes Defendants to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer.

383.    The hardware and BMP-2 used by Defendants on Plaintiff are medical devices covered by the SMDA.

53

384. Defendants violated the SDMA by failing to report the failed hardware as required by the SDMA.

385. Defendants violated the SDMA and other applicable law by failing to report the failed Infuse/BMP-2 as required by the SDMA and other applicable law.

386. Defendant's failure to report this adverse event is part of a larger, widespread conspiracy by Defendants to underreport, mis-report and avoid reporting actual hardware implant failures that occurred at Defendants' facilities.

387. Defendants failed to report Plaintiff's failed hardware and BMP-2, and this failure caused harm to Plaintiff since the government and manufacturer remain unaware of the adverse event, and cannot investigate, assist, and/or provide guidance in Plaintiff's future care.

388. Plaintiff has suffered, inter alia, a delay in future accurate medical treatment caused by Defendants failure to report the failed hardware and BMP-2.

389. Plaintiff could have had the assistance of government intervention and/or investigation, but for Defendants' failure to report the failed hardware and BMP-2.

390. Pursuant to the SMDA, device user facilities (Defendants) must also report device-related serious injuries to the manufacturer, or to the FDA if the manufacturer is not known. These Defendants failed to report the failed hardware and BMP-2 to the manufacturer or the FDA.

391. The SMDA also requires device user facilities submit to FDA, on a semiannual basis, a summary of all device failure reports submitted during that time period. Defendants failed to accurately report the information contained in this Complaint to the FDA and the manufacturer, including Plaintiff's failed hardware and BMP-2.

54

392.     Defendants are obligated and have a duty to obey Section 361 of the Public
         Health Service Act, codified at 42 U.S.C. § 264 [the "PHS Act"] and the Federal
         Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 321 (g) and 331(a), and other applicable
         statutes.

393.     Defendants' violations of the acts and obligations represent strong evidence that
         the Defendants negligently hired, retained, supervised and granted privileges to Dr.
         Durrani.

## ALLEGATIONS AGAINST DR. DURRANI & CHILDREN'S

394.     Dr. Durrani should have never had privileges in the first place at Children's
         Hospital and they should have removed those privileges based upon what they knew.

395.     The Plaintiffs had no knowledge of the use of BMP-2 by Dr. Durrani and
         Children's Hospital in Plaintiffs.

396.     While at Children's, Dr. Durrani changed scoliosis measurements so he could
         perform surgeries.

397.     While at Children's, Dr. Durrani performed a dangerous high volume of surgeries
         on patients.

398.     While at Children's, Dr. Durrani would begin a surgery, leave and have fellows,
         residents or other surgeons complete a surgery or do the full surgery.

399.     Children's Board and administration knew about Dr. Durrani doing too many
         surgeries and not properly doing the surgeries. They did nothing.

400.     While at Children's, Dr. Durrani would repeatedly add surgeries claiming they
         were emergencies when they were not.

55

401.    While at Children's, Dr. Durrani would leave a spine surgery patient for four or
        five hours in the surgery suite under the care of fellows or residents, unsupervised and
        sit in his office and check on the surgery as he pleased.

402.    While doing research at Children's, Dr. Durrani would misstate facts regarding
        his research.

403.    On information and belief, Dr. Durrani used his relationships with Children's
        officials to purge his Children's file of all patient safety and legal issues which had
        occurred as part of his departure "deal".

404.    Children's knew all the facts pertaining to Dr. Durrani's career, as well as Dr.
        Durrani's prior issues at Deaconess, Good Samaritan and Christ, and chose to ignore
        them in reviewing Dr. Durrani's application for privileges at Children's.

405.    Children's Hospital had the duty to properly privilege with quality of care and
        patient safety in mind and they breached that duty and that breach caused harm to
        Plaintiffs.

406.    Dr. Durrani and Children's Hospital committed fraud by misrepresenting Dr.
        Durrani's reputation. Children's Hospital knew he was doing unnecessary spine
        surgeries and concealing them from Plaintiffs.

407.    Dr. Durrani's deviations and violations of law, policies, bylaws, rules and
        regulations of Children's harmed patients and Plaintiffs.

408.    Dr. Durrani was abusive to his and Children's staff both in work hours, demands
        and sexual harassment.

409.    Dr. Durrani never cared about others schedules in scheduling surgery at
        Children's.

56

410.   Dr. Durrani declared surgeries an emergency to ignore schedules.

411.   Spine surgeons usually do one or two a day, possibly three surgeries a day if an emergency. Dr. Durrani would often do four, five and even six surgeries. A schedule at Children's shows eight.

412.   Dr. Durrani would walk from surgical room to surgical room with all the spine patients "open" for an extended time past the standards of care.

413.   Gerry Goodman, at West Chester, would complain to Dr. Durrani about patients being anesthezed and the operative site open for long periods of time. Upon information and belief, staff and others complained at Children's for the same.

414.   When Dr. Durrani performed with Dr. Shanti these multiple simultaneous procedures, they were billed as if he was the attending surgeon in all the surgeries. Childrne's knew this and did not stop it.

415.   At West Chester, Dr. Shanti and Dr. Durrani "open and switch" to do the surgery, we have labeled the "Shanti Shuffle." Others would do the same with Dr. Durrani at Children's.

416.   Dr. Durrani had all the "red flags" from over utilization and being bounced out of other area hospitals. Children's knew about the "red flags."

417.   Gerry Goodman checked the written consents of BMP-2 patients including Plaintiffs of West Chester which Dr. Durrani, CAST and West Chester/UC Health had them sign and confirmed they did not provide consent to BMP-2. Upon information and belief, staff and others complained at Children's for the same.

418.   At West Chester, Gerry Goodman reported to no avail patient safety issues caused by the OR staff working from 7 AM to midnight on Dr. Durrani patients. Fatigue

57

caused deviations in standard of care by West Chester/UC Health staff's including in Plaintiffs. Upon information and belief, staff and others complained at Children's for the same.

419.    Despite having full knowledge of the issue, Children's board and management allowed patients including Plaintiffs to have BMP-2 placed in them by Dr. Durrani at their facility without warning them, with full knowledge they were not warned.

420.    At West Chester, Gerry Goodman knew anesthesia charged per the minute or in fifteen minute increments and she considered it a fraud to bill for unnecessary anesthesia when patients were "open" longer than necessary. Upon information and belief, staff and others complained at Children's for the same.

421.    During surgeries, Medtronics and other vendors would want to up sell products.

422.    At West Chester, Gerry Goodman verified Dr. Shanti was not on the written informed consents for these procedures. Upon information and belief, staff and others complained at Children's for the same.

423.    Dr. Durrani had no supervision at all at Children's Hospital.

424.    High volume of fusions of the spine was not usual practice.

425.    Children's has previously denied tracking BMP-2. They lied. They tracked it to analyze the profit. They liked the profit. They encouraged Dr. Durrani to place all the BMP-2 he could.

426.    Children's board and management, increased the cost of the surgeries of Plaintiffs and patients by using BMP-2 infuse including in Plaintiffs.

427.    Dr. Durrani would also sign operative reports he never dictated with the full knowledge of Children's board and management.

58

428. Surgeons who worked at Children's dictated operative reports they never signed with the full knowledge of Children's board and management.

429. The purpose of advertising, marketing and other public relation materials were to cause patients and Plaintiffs to either choose Children's to have their procedure, or not complain or question the fact they were having their procedure at Children's Hospital. Plaintiffs relied upon the reputation of Children's.

430. Children's failed to properly screen, check out, discipline and regulate Dr. Durrani from the date of his application until his departure.

431. Children's, through their board and management while governing Children's, failed to follow their own bylaws, policies and regulations pertaining to credentialing, privileges and discipline for Dr. Durrani.

432. Plaintiffs were required to make payments of uncovered medical bills to Dr. Durrani and Children's.

433. The Kentucky and Ohio Medical Boards were not provided information from Defendants which they were legally required to report to them.

434. Children's violated their operating room rules and allowed Dr. Durrani to violate those rules.

435. Dr. Tyaeb will testify that Dr. Durrani improperly selected patients for surgery, and then recommended surgery.

436. It was negligent for Children's not to have proper checks upon and supervision of physicians and this proximately caused Plaintiffs harm because it created the environment which allowed Dr. Durrani to do that which he did.

59

437.    Dr. Durrani made the records appear that Dr. Durrani was doing all the
procedures when Children's knew it was often times other surgeons.

438.    In summary, Gerry Goodman, Vickie Scott, Scott Rimer and other OR staff
members complaints to West Chester management included the number of Dr. Durrani
surgeries he did a day and at a time; other surgeons performing surgeries for him
without proper consent; Dr. Shanti not having proper qualifications and provider
numbers; BMP-2 was tracked by the hospital despite their denials of doing so; Dr.
Durrani was verbally abusive to everyone; anesthesiologists had to have patients
"under" longer than they should have been; off label use of BMP-2 was not covered by
informed consent; Medtronic reps would "up-sale" during surgeries; operative reports
were not timely completed; Dr. Durrani had no supervision by the hospital; keeping OR
staff past the time it was safe. Upon information and belief, staff and others complained
at Children's for the same.

439.    Dr. Durrani, by his deposition testimony, admits he relies upon his own reading of
radiology and did so on Plaintiffs and other Children's patients.

440.    Dr. Durrani, by his deposition testimony, admits he informs the pain doctor where
to inject medicine. By doing so in the wrong place, he convinced patients to have repeat
surgeries. He did this to Plaintiffs.

441.    Dr. Durrani prescribes a custom compound cream he sells to patients without
informing them which he bills to their insurance and just sends to them.

442.    Dr. Durrani always told Thomas Kunkel, MD, West Chester anesthesiologist, the
surgeries were emergencies. Upon information and belief, staff and others complained
at Children's for the same.

60

443.    While at Children's, Dr. Durrani would sometimes, because he was running

behind, cancel part of a surgery or do only part of the surgery, thus requiring the patient

to have another surgery, all without informing the patient the cancellation was because

he was late.

444.    An affidavit of merit with CV has been filed in all these cases by Bruce Podrat,

MBA/MHA which states in part that Children's, acting through their board, managers,

supervisors, staff, employees, agents and representatives were negligent by: "permitting

Dr. Durrani to perform medically unnecessary surgeries at their facilities; failing to

obtain proper informed consent to use the allografts BMP-2 and Puregen in surgeries at

their facilities while these products were not approved by the FDA; failing to supervise

the large volume of surgeries performed by Dr. Durrani; failing to supervise the medical

record documentation of Durrani; failing to require Durrani to adhere to applicable

hospital policies and procedures; permitting Durrani to use unapproved allografts on

persons without an Investigational New Drug (IND) permit from the FDA; failing to

report hardware failures as required by federal law; failing to report settlements to the

NPDB; failing to report Durrani's termination of privileges to the NPDB; permitting

Durrani to perform medically unnecessary surgeries; negligently supervising and

permitting vendors of BMP-2 and Puregen to be present during surgeries in which their

products were being implanted into patients without the patients' permission and/or

informed consent; administering the insurance precertification and medical billing for

medically unnecessary surgeries; conducting medical billing fraud; permitting the use of

"cut and paste" operative reports; permitting Durrani to (untimely) dictate surgical

61

operative reports weeks, months, years and in some instances never; failure to supervise; negligent credentialing; negligent privileging; and medical negligence.

445. Dr. Durrani used BMP-2 in surgeries in Plaintiffs not approved by Medtronics including the very uses Medtronics does not recommend or allow as detailed in the BMP-2 package inserts.

446. Plaintiffs were not informed by Dr. Durrani or Children's board and management, staff or employees of Dr. Durrani used BMP-2 by Dr. Durrani in their surgery.

447. Dr. Durrani used BMP-2 in children, including Plaintiffs, with the full knowledge of Children's.

448. Dr. Durrani used BMP-2 in all levels of the spine, including the Plaintiffs with full knowledge of Children's.

449. Dr. Durrani used BMP-2 without this six month non-operative treatment with the full knowledge of Children's in Plaintiffs.

450. Dr. Durrani used BMP-2 with and without a cage with the full knowledge of Children's including Plaintiffs.

451. Medtronics required a "carrier scaffold" to be used together with BMP-2. Dr. Durrani did not do so with the full knowledge of the Children's in many Plaintiffs.

452. Medtronics refers medical providers to see the package insert of BMP-2 for the complete list of indications, warnings, precautions, adverse events, clinical results and other important medical information. Dr. Durrani and Children's did not inform Plaintiffs of this information.

453. Dr. Durrani was never properly trained and he misused BMP-2 with the full knowledge of Children's.

62

454. Dr. Durrani also misused in Plaintiffs screws and other hardware manufactured by Medtronics.

455. Dr. Durrani ignored radiograph findings, other diagnostic tests and physical findings to perform unnecessary spine surgeries, including Plaintiffs.

456. FDA required Dr. Durrani and Children's to report all adverse circumstances pertaining to Dr. Durrani patients and they have failed to do so, including Plaintiffs.

457. At Children's, Dr. Durrani routinely falsified his diagnoses and deceived his patients through omission of risks to perform surgeries that were unnecessary including Plaintiffs.

458. Children's board and management, and Dr. Durrani never informed Plaintiffs that Dr. Durrani was a paid consultant for Medtronic.

459. Dr. Durrani in deposition testimony in related cases admitted under oath he never informs a patient, including Plaintiffs, of his Medtronic relationship.

460. "Hank," Dr. Durrani's German Shepherd dog, was permitted to have contact with many of Dr. Durrani's Children's patients, knowing "Hank" had MRSA. Based upon Hank's vet records, there is a probability Dr. Durrani has MRSA or is a carrier of MRSA. He has refused to be tested for MRSA. Upon information and belief, Dr. Durrani has caused patients infections including Plaintiffs.

461. In addition, the management, staff, employees and agents of Children's know the Children's Staff Bylaws, Rules, Policies and Regulations including OR rules were violated by Children's and Dr. Durrani by not following them and their breach of their duty under them caused harm to Plaintiffs.

63

462. Children's and Dr. Durrani violated Ohio Product Liability Act, RC. 2307.71-2307.80;

463. Children's and Dr. Durrani violated 42 C.F.R. §482.13, codifying the Patient's Right to Informed Consent;

464. Children's and Dr. Durrani violated 42 C.F.R. §482.51, covering the informed consent of surgical patients;

465. Children's and Dr. Durrani violated 45 C.F.R. Part 46, et seq., specifically 45 C.F.R. §46.122, covering the conducting of medical research on human subjects with the support of federal funds, known as the "Common Rule";

466. Children's and Dr. Durrani violated 18 U.S.C. §1035, covering the criminal act of making "False Statements Relating to Health Care Matters" involving any health care benefit program, public or private;

467. Children's and Dr. Durrani violated 18 U.S.C. §1347 of the Criminal Code covering "Health Care Fraud" involving any health care benefit program, public or private;

468. Children's and Dr. Durrani violated 18 U.S.C. §§ 1341, 1343, 1956, 1957, and 2314 covering "Mail Fraud", "Wire Fraud", "Money Laundering", "Use of Dirty Money", and "Travel to Effect the Scheme", to effectuate the fraudulent scheme; and

469. Children's and Dr. Durrani violated the warning letter from the FDA dated June 23, 2011 warning against promoting and marketing PureGen without FDA approval; and for violating the Food Drug and Cosmetic Act, 21 U.S.C. § 351, et seq., by marketing a device without premarket approval, 510k clearance, meeting the humanitarian device exception, exemption from the Act, or other qualification to market the device; for

64

violating the Public Health Service Act 42 U.S.C. §201, et seq., specifically § 262(a) and (i), and related federal regulations, specifically 21 C.F.R. 1271.10(a)(4)(ii)(b); for violating the Food Drug and Cosmetic Act 21 U.S.C. §351, et seq., specifically § 355(a) and (i), and 21 C.F.R. 312; and the Public Health Service Act 42 U.S.C. 262, specifically § 262(a) and (i).

470.    Children's, their boards and management, failed to protect Plaintiffs from Dr. Durrani.

471.    While at Children's, Dr. Durrani allowed patients to be under anesthesia longer than the standard of care allows for a spine patient to be under anesthesia.

472.    Children's knew Dr. Durrani "cut and paste" operative reports for patients on whom he performed spine surgeries.

473.    While at Children's, Dr. Durrani often did not complete an operative report at all on patients whom he performed spine surgeries.

474.    While at Children's, Dr. Durrani offered money to female nurses and female staff for sex including in the operating room, during spine surgeries, in front of the entire operating room staff.

475.    Children's upon information and belief threatened and retaliated against employees of Children's who complained about Dr. Durrani to the boards and management of Children's.

476.    While at Children's, Dr. Durrani would bid on EBay during spine surgeries, including once for a Lamborghini at West Chester.

477.    Dr. Durrani performed unnecessary spine surgeries on Plaintiffs and this proximately caused serious bodily injury and/or harm to Plaintiffs.

65

478.    Dr. Durrani, with the full knowledge of Children's board and management, convinced Plaintiffs with false representations that surgery was their only option, when in fact the patient did not need surgery.

479.    Dr. Durrani, with the full knowledge of Children's board and management, convinced Plaintiffs with false representations that Plaintiffs' medical situations were urgent and required immediate surgery.

480.    Dr. Durrani, with the full knowledge of Children's board and management, convinced Plaintiffs with false representations that Plaintiffs were at risk of grave injuries without the surgery Dr. Durrani recommended.

481.    Dr. Durrani, with the full knowledge of Children's board and management, convinced Plaintiffs with false representations that Plaintiffs risked paralysis or their head would fall off if the Plaintiffs were in a car accident.

482.    Dr. Durrani, with the full knowledge of Children's board and management, did not read or ignored the radiology reports written by the radiologists for imaging studies that Dr. Durrani ordered on Plaintiffs including x-rays, CAT scans and MRIs and failed to disclose this to Plaintiffs.

483.    Dr. Durrani, with the full knowledge of Children's board and management, convinced Plaintiffs with false representations that Plaintiffs based upon Dr. Durrani's own exaggerated and dire reading of the patient's imaging that was either inconsistent with or plainly contradicted by the report written from the radiologist, that Plaintiffs needed surgery.

484.    Dr. Durrani, with the full knowledge of Children's board and management, provided a false reading to Plaintiffs of their pre-surgical imaging.

66

485.    Dr. Durrani, with the full knowledge of Children's board and management, dictated he had performed certain physical examinations and procedures on Plaintiffs that he did not actually perform.

486.    Dr. Durrani, with the full knowledge of Children's board and management, ordered a pain injection for a level of the Plaintiffs' spine that was inconsistent with the pain stated by the Plaintiffs or the imaging.

487.    Dr. Durrani, with the full knowledge of Children's board and management, scheduled Plaintiffs for surgeries without learning or waiting for the results of certain pain injections or related therapies on Plaintiffs.

488.    Dr. Durrani, with the full knowledge of Children's board and management, dictated Plaintiffs' operative reports or other Plaintiffs' records months after the actual treatment.

489.    Dr. Durrani, with the full knowledge of Children's board and management, placed in Plaintiffs' operative reports and treatment records false statements about the diagnosis for the Plaintiffs, the procedures performed, and the instrumentation used in the procedure.

490.    Dr. Durrani, with the full knowledge of Children's board and management, failed to inform the Plaintiffs of or misrepresented the nature of the complications they experienced as a result of the surgeries he performed on Plaintiffs.

491.    Dr. Durrani, with the full knowledge of Children's board and management, made false statements to colleagues about the success of Plaintiffs' surgeries.

ELECTRONICALLY FILED 10/31/2013 11:44 / IFOJ / A 1307306 / CONFIRMATION NUMBER 291177

492.    Dr. Durrani, with the full knowledge of Children's board and management, made false statements to Plaintiffs about why a surgery would not be performed at a certain hospital.

493.    Dr. Durrani, with the full knowledge of Children's board and management made false statements to Plaintiffs regarding why he no longer practiced at certain hospitals.

494.    Plaintiffs were left in a worse financial and medical condition and position due the unnecessary surgeries Dr. Durrani performed.

495.    Dr. Durrani and Children's by their board and management, knowingly and willfully executed and attempted to execute their scheme and artifice to defraud, obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of health care benefit programs as defined in Title 18, United States Code, Section 24(b ), in connection with the delivery of, billing, and payment for health care benefits, items, and services including to Plaintiffs.

496.    Each of the Defendants each have in their possession the Plaintiffs' billing records for each of Dr. Durrani's surgeries at Children's.

497.    Dr. Durrani and Children's knew none of the billings should have billed or collected from Plaintiffs, their income or their private or public healthcare benefit programs, yet they still billed and collected money for the bill from Plaintiffs and their private or public healthcare benefit programs.

498.    Dr. Durrani and Children's in conspiracy with full cooperation and assistance of each other participated in the unnecessary surgeries of Plaintiffs which were billed to

68

Medicare, Medicaid, and private insurance for each of the Defendants' economic benefit.

499. Dr. Durrani and Children's used the mail, the internet, and the telephone lines in interstate commerce to execute their conspiracy.

500. Children's board and management allowed Dr. Durrani to be privileged and remain privileged because they needed the economic benefit of Dr. Durrani's high volume of surgeries including Plaintiffs'.

501. Children's board and management knew the reasons of Dr. Durrani's removal from the Hospital and Christ Hospital due to patient care issues prior to Dr. Durrani's application for privileges at West Chester/UC Health.

502. Peter Stern, MD, President and/or Chief of Staff (at one time) of West Chester Medical Center (West Chester/UC Health) knew Dr. Durrani was a patient safety issue, but West Chester Medical Center was in such financial trouble West Chester/UC Health "looked the other way."

503. Dr. Durrani, acting individually and through CAST, deviated from the standard of care for a spine surgeon by failing to exercise the skill, care and diligence of a spine surgeon under like or similar circumstances in his treatment of Plaintiffs and that deviation proximately caused harm to Plaintiffs as detailed in Plaintiffs Complaint and herein.

504. Children's, their Board, their management, staff, employees, nurses, technicians and agents, all during the scope of their employment and/or agency owed Plaintiffs the duty to exercise the degree of skill, care, and diligence of an ordinary prudent health care provider and hospital would have exercised under like or similar circumstances as

69

detailed in the Plaintiffs' Complaint and herein and they breached their duty. The breach proximately caused harm to Plaintiffs.

505.    Children's management, staff, employees, nurses, technicians and agents, all during the scope of their employment and/or agency as identified in each of Plaintiffs medical records, and with the full blessing of the Board, knowingly and/or negligently, as reflected in each Plaintiffs admission, pre-op, operative, post op and discharge records, participated and assisted Dr. Durrani in the surgery and committed the following malpractice by breaching their duty as follows:

A.    Negligently screened Plaintiff for surgery.

B.    Negligently approved Plaintiff for the surgery.

C.    Negligently admitted Plaintiff for surgery.

D.    Negligently allowed Plaintiff to be placed under general anesthesia.

E.    Negligently documented the surgical procedure.

F.    Negligently failed to obtain informed consent.

506.    The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of Children's, with Board consent, knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of Children's.

507.    Children's Board Members, managers, supervisors, representatives, employees, nurses, technicians, staff, and agents all during the scope of their employment and/or

70

agency knew BMP-2 should not have been used on Plaintiffs, yet assisted Dr. Durrani in its use. They logged it. They touched it. They assisted in its placement.

508.    Children's Board, management, staff, employees, nurses, technicians, agents and representatives should have refused to assist Dr. Durrani in these procedures on Plaintiffs.

509.    Children's OR staff, employees, agents, representatives, nurses and technicians, all during the scope of their employment and/or agency, scrubbed for Dr. Duranni during these procedures including Plaintiffs. They handed him instruments. They provided anesthesia. They provided medicine. They provided medical care alongside Dr. Durrani. They prepped and assisted in recovery. They knowingly, intentionally, willingly and in breach of their duties aided and abetted Dr. Durrani in his malpractice, fraud and criminal acts in the same manner as an accessory drives the getaway car or an accomplice holds the bank door.

510.    In addition, at Children's, they aided and abetted in Dr. Durrani OR schedule manipulation; the extended schedules; too many surgeries at once; too long anesthesia; too long open wounds and the falsifying of medical records. They could have quit. They could have sought employment elsewhere. They could have been a whistleblower. They could have gone to the media. Unfortunately for the unsuspecting Durrani Plaintiffs, including these Plaintiffs, they did not have the courage under threat of blackballing and loss of employment by Children's Board and Management.

511.    Children's was responsible for the hiring, credentialing, screening, supervision, oversight, and acts and omissions of Dr. Durrani. They failed in these obligations and these failures cased harm to Plaintiffs.

71

512.    Children's had a duty to report settlement(s) of malpractice claims of Dr. Durrani,

Durrani's negligence, hardware implant failures, off label use of drugs and biologics, off

label marketing of drugs and biologics, and/or adverse medical and ethical events

pertaining to Dr. Durrani to the National Practitioner Data Bank, the relevant state

medical licensing boards, state and federal government, the public, insurance companies,

and the Plaintiffs. They failed to do so and these failures caused harm to Plaintiffs.

513.    Children's violated the Safe Medical Device Act, Public Law 101-629, as

amended, by failing to report that Durrani's hardware implants failed, required removal,

revision surgeries, corrective surgeries, broke, fractured, broke through the skin,

dislodged, and/or caused serious bodily injury and harm to Durrani patients including

Plaintiffs.

514.    Children's had a duty to reasonably supervise, control, monitor, report, inform,

and oversee the conduct and consequences of Dr. Durrani, as well as the accurate

reporting of information about his malfeasance, in order for Plaintiffs to make an

informed choice and consent to future medical care.

515.    Children's provided Dr. Durrani inter alia, direct and indirect financial support,

control, medical facilities, logistics, billing and insurance payment support, staff

support, medicines, drugs, biologics, equipment, and tangible items for use on patients

in medically unnecessary diagnostic procedures, surgeries and medical care, including

the diagnosis and treatment of Plaintiffs.

516.    Children's misled Plaintiffs about Durrani's character, reputation in the medical

community, his malfeasance, his potential for harm, and the risks associated with

continuing care with Dr. Durrani.

72

517.   Children's knew that Dr. Durrani had his privileges terminated and/or refused at Christ Hospital, Good Samaritan Hospital, Deaconess Hospital, and St. Elizabeth Hospital.

518.   Children's did not properly inform Plaintiffs that Dr. Durrani had his privileges terminated and/or refused at Christ Hospital, Children's Hospital, Good Samaritan Hospital, Deaconess Hospital and St. Elizabeth Hospital.

519.   Children's failed to inform the appropriate authorities that Durrani had resigned in lieu of termination and/or had his privileges terminated so these authorities could protect the public.

520.   Children's failed to inform these authorities that Durrani was performing unnecessary surgeries, implanting unnecessary hardware, settlements, resignation in lieu of termination, termination of privileges, hardware failures, and/or negligently diagnosing patients EDS.

521.   Children's violated the HCQIA, 42 USC 11151, by failing to report the termination and/or resignation in lieu of termination to the National Practitioner Databank.

522.   Children's violated the SMDA by not reporting the instances of implant hardware's causing serious injury related to Durrani's negligence.

523.   Children's breached their duty to Plaintiffs, inter alia, by not properly supervising and controlling the actions of Dr. Durrani, other doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiffs.

524.   At all times relevant, Dr. Durrani was an agent and a member of the Medical Staff of Children's.

73

525.    Defendant Dr. Durrani was performing within his scope of employment, agency relationship, and/or for the financial gain of Children's when dealing with the Plaintiffs.

526.    Children's is responsible for harm caused by acts of employees and agents which conduct occurred within the scope of employment under the theory of respondent superior, ostensible agency, and/or vicarious liability.

527.    As a direct and proximate result of these Defendants' acts and omissions by and through its agents and/or employees, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

528.    Children's was responsible for the hiring, credentialing, screening, oversight, and conduct of its residents, doctors, nurses, and those doctors with privileges at the hospital including Dr. Durrani.

529.    Dr. Durrani committed battery against Plaintiffs by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2 in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to the Plaintiffs.

530.    Children's made material, false representations to Plaintiffs and their insurance company related to Plaintiffs' treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiffs, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiffs would be walking normally within days after each surgery, that the procedures

74

were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, that "I will fix you", that Plaintiffs were medically stable and ready to be discharged.

531.    Dr. Durrani's conduct is so outrageous and it was the proximate and actual cause of the Plaintiffs' psychological injuries, emotional injuries, mental anguish, suffering, and distress.

532.    The Safe Medical Devices Act ("SMDA") of 1990 (Public Law 101-629) is a federal law that became effective November 28, 1991. Children's and Dr. Durrani violated this law.

533.    Dr. Durrani and Children's failed to report Plaintiffs' failed hardware and BMP-2, and this failure caused harm to Plaintiffs since the government and manufacturer remain unaware of the adverse event, and cannot investigate, assist, and/or provide guidance in Plaintiff's future care.

534.    Dr. Durrani and Children's violated 42 USC 11151 by failing to report to the National Practitioner Databank that Dr. Durrani's privileges were terminated from Children's Hospital.

535.    Dr. Durrani and Children's had a duty to prevent illegal, off label, and improper marketing of bone graft and spine surgery implant hardware at their facilities and they breached this duty and this breach proximately caused harm to Plaintiffs.

536.    The informed consent forms from Children's which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani and Children's each required an informed consent release.

75

537. Children's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

538. Children's omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

539. Dr. Durrani and Children's altered documents, including medical records to further their schemes including the delay in the production of records to allow records to be "cleansed."

## THE POLICIES, BYLAWS, RULES, REGULATIONS OF WEST CHESTER/UC HEALTH WHICH DR. DURRANI, CAST, WEST CHESTER/UC HEALTH BOARD MANAGEMENT VIOLATED

540. Having laid a comprehensive factual foundation, Plaintiffs can now easily apply these facts to the strongest source of West Chester/UC Health liability. All the preceding factual allegations support the assertions in the section.

541. All of the following Bylaw references and violations apply to all Plaintiffs with claims against West Chester/UC Health with Butler County litigation against Dr. Durrani and West Chester/UC Health.

542. West Chester/UC Health employed staff who worked in the OR, including OR nurses, staff and management, who breached the standard of care as it relates to the care and treatment of Plaintiffs based upon their staff participating in Dr. Durrani's deviations as fully described herein.

543. The medical records of Plaintiffs reflect those employees of West Chester/UC Health who participated in each Dr. Durrani surgery.

76

544. In addition, the management, staff, employees and agents of West Chester/UC Health know and knew the West Chester/UC Health Medical Staff Bylaws, Rules, Policies and Regulations including OR rules which are now detailed after this paragraph and they violated these bylaws, rules, policies and regulations by not following them, and they breached their duty under them which caused harm to Plaintiffs.

545. There is no more culpability by West Chester/UC Health stronger than their failure to do their duty under their own rules as described herein.

546. The letter to a physician accompanying an application for privileges at West Chester states in part: "West Chester Medical Center...a very dedicated, compassionate group of clinical and administrative professionals. Our team is eager to serve the community..."

547. Nothing is further from the truth. It should read: "We want doctors who can make us money regardless what happens to patients."

548. Dr. Durrani in 2008 would have had to complete an application. It has not been produced under claim of privilege.

549. In May 2009, the Health Alliance of Greater Cincinnati, Inc. still was involved at West Chester Medical Center. Their name appears on the West Chester Medical Center, Medical Staff Bylaws. The Health Alliance is now known as UC Health according to their Ohio Secretary of State business filings.

550. The Bylaws have been amended from time to time, but for the most part remain the same.

77

551. **The Preamble of the West Chester Bylaws** states in part the Medical Staff is the "self-governing body" of the Medical Center.

552. Board as defined in the bylaws "means the governing board of the Medical Center which shall have final responsibility for the affairs of the Medical Staff."

553. Dr. Durrani from January 1, 2009 to May 2013 was a member of the Medical Staff.

554. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** Board means the governing board of the Medical Center (i.e., its Board of Trustees or Directors) which shall have final responsibility for the affairs of the Medical Staff.

555. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Clinical Privileges or Privileges means the rights granted to a Practitioner to provide those diagnostic, therapeutic, medical, surgical, dental or podiatric services specifically delineated to the Practitioner."

556. The Board of West Chester failed in their responsibility to "govern the affairs of the Medical Staff."

557. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Credentialing Plan means the credentialing plan described in Medical Center's Medical Staff Credentialing Plan, contained in Section II of these Bylaws."

558. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Department Director means the person voted on by a Majority of Active Staff Members of the Department, recommended by the Medical Executive Committee, and approved by the Board."

78

559. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Senior Vice President means the individual bearing that title, or a like title, who is appointed to act on the Medical Center's behalf in the overall administrative management of the Medical Center."

560. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical Executive Committee means the group of Medical Staff Members and Ex officio representatives chosen to represent and coordinate the overall activities and policies of the Medical Staff and its subdivisions."

561. The Medical Executive Committee was chosen to ensure Dr. Durrani and everyone else with privileges or employed at the hospital followed the policies.

562. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical Staff or staff means the formal organization created by the Board, composed of Practitioners who have been appointed by the Board to assist the Medical Center in carrying out certain assigned functions."

563. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical Staff Bylaws or Bylaws shall mean the bylaws of the West Chester Medical Center medical Staff, including but not limited Section I: Medical Staff Bylaws, Section II: Medical Staff Credentialing Plan, Section III: Fair Hearing Plan, and Section IV: Rules and Regulations."

564. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical Staff Policies shall mean the policies and procedures adopted by the Medical Staff, and approved by the Medical Executive Committee and the Board, from time to time. These shall include these Medical Staff Bylaws, the Credentialing

79

Plan, the Fair Hearing Plan, the Rules and Regulations and any other policy deemed necessary and appropriate to carry out the duties and responsibilities of the medical staff delegated by the Board."

565. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Representative means the Board and any director, trustee or committee thereof; the Senior Vice President, or the Senior Vice President's designee; any employees of other organizations; a Medical Staff organization or any committee of the Medical Staff or the Board, and any individual authorized by any of the foregoing performing specific information gathering, analysis, use or disseminating functions, which relate to any Professional Review Activity (as that term is defined under HCQIA)."

566. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Section 1.3 of Medical Staff Bylaws Purposes: The purposes of the Medical Staff are, without limitation to provide oversight over the quality of care, treatment and services delivered by Practitioners who are credentialed and privileged through the Medical Staff credentialing process."

567. Medical Staff negligently and intentionally did not provide this oversight over Dr. Durrani as set forth throughout this Complaint.

568. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** Section 1.4 of Medical Staff Bylaws Responsibilities: It is the obligation and responsibility of the Medical Staff to improve the quality of care, treatment and services and patient safely through participation in the Medical Center performance improvement program by assisting in the evaluation of Practitioner's credentials for

80

initial and continuing medical staff appointment and for the delineation of clinical
privileges in a manner that is thorough, evidence-based, effective and timely.

569.    Medical Staff negligently and intentionally did not properly evaluate Dr. Durrani
        as required under Section 1.4 as set forth in throughout this Complaint and this
        proximately caused harm to Plaintiffs.

570.    **West Chester/UC Health bylaws for West Chester Medical Center states in
        part:** "Section 3.1 GENERAL OFFICERS OF THE MEDICAL STAFF: The
        Medical Staff Officers shall be A) President of the Medical Staff; B) President Elect
        of the Medical Staff; C) Department Director of Surgery; D) Department of Director
        of Medicine; E) Chair of the Credentials Committee."

571.    **West Chester/UC Health bylaws for West Chester Medical Center states in
        part:** "Section 3.2 DUTIES OF MEDICAL STAFF OFFICERS President of the
        Medical Staff: The President of the Medical Staff serves as the Chief Medical Officer
        of the Medical Center. As the principal elected official of the Medical Staff shall: A)
        Aid in coordinating the activities and concerns of the Medical Center Administration
        and of the nursing and other patient care services with those of the Medical Staff;
        Communicate and represent the opinions, policies, concerns, needs and grievances of
        the Medical Staff to the Board, the Senior Vice President and other officials of the
        Medical Staff; C) Be responsible for the enforcement of the Medical Staff Bylaws,
        Rules and Regulations, and other Medical Staff policies, and for implementation of
        sanctions and corrective action where indicated, and for Medical Staff compliance
        with procedural safeguards in all instances where corrective action has been requested
        against a Practitioner; D) Call, preside at, and be responsible for the agenda of all

81

general Medical Staff meetings; E) Serve as Chairperson of the Medical Executive
Committee and may serve as an Ex Officio member of all the Medical Staff
committees."

572.    The Presidents of the Medical Staff negligently and intentionally from January
2009 to May 2013 failed in these responsibilities as they pertained to Dr. Durrani as
set forth in this Complaint and this proximately caused harm to Plaintiffs.

573.    **West Chester/UC Health bylaws for West Chester Medical Center states in
part:** "The Department Director of Surgery may organize or operate specialty
sections to assist in carrying out the purposes of the Department advancing education
or improving patient care. Each Department Director may, with Medical Executive
Committee approval, establish such sections within his or her department and
designate the membership of each as he or she deems appropriate. The Department
Director of Surgery shall be an ad-hoc member of any committee within any other
Defendant."

574.    West Chester/UC Health bylaws for West Chester Medical Center state in part:
"The Department Director of Medicine may organize or operate specialty sections to
assist in carrying out the purposes of the Department advancing education or
improving patient care. Each Department Director may, with Medical Executive
Committee approval, establish such sections within his or her department and
designate the membership of each as he or she deems appropriate. The Department
Director of Medicine shall be an ad-hoc member of any committee within any other
Defendant."

82

575. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "The Credentials Chair will assist in organizing a credentials committee for the Medical Center in which there are at least three physician representatives each from the disciplines of both medicine and surgery and at least one physician representative from the discipline of emergency medicine."

576. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Section 3.3 OTHER OFFICIALS OF THE MEDICAL STAFF- Each Department Director shall be a board certified appointee of the Active Staff, and shall be willing and able to discharge the functions of the office. Should a Department Director be recruited or nominated who is not a Member of the Active Medical Staff, the initial appointment of such Member as a Department Director shall be designated as "acting" until such time as Active Staff status is achieved."

577. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Each Department Director shall: A) Be accountable to the Medical Executive Committee and to the President of the Medical Staff for all professional, administrative and clinical activities within his or her Department and particularly for the quality of patient care rendered by appointees of the Department and for the effective conduct of the patient care evaluation and monitoring functions delegated to his or her Department; B) Coordinate and ensure Department staff members participate in the continuous assessment and improvement of the quality of care and services provided and maintenance of quality control programs as appropriate; C) Submit reports to the Medical Executive Committee as required concerning: 1) findings of Department review, evaluation and monitoring activities, actions taken

83

thereon, and the results of such action; 2) recommendations for maintaining and improving the quality of care provided in the Department; 3) recommending criteria for clinical privileges relevant to the care provided within the Department; 4) recommendations for the number of qualified and competent Practitioners that the Department Director deems appropriate to provide patients with appropriate levels of care and services; 5) such other matters as may be required by the Medical Executive Committee."

578.    The Director of Surgery, Director of Medicine, the Credentials Chair and each Department director negligently and intentionally failed in their responsibilities as to Dr. Durrani set throughout this Complaint and these failures proximately caused harm to Plaintiffs.

579.    The Department heads and the President of staff intentionally and negligently failed to monitor Dr. Durrani, review his credentials and assess his utilization and these failures proximately caused harm to Plaintiffs.

580.    In fact, these bylaw provisions consistently reference quality of care. Dr. Durrani was a complete failure in quality of care and the "blood" is on the hands of those who under these Bylaws decided West Chester "needed the money."

581.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Develop and implement Departmental programs in cooperation with the President of the Medical Staff and consistent with the provisions of Article IV, for evaluation of patient care, ongoing monitoring of practice, credentials review and privilege delineation, medical education and utilization review, including orientation

84

and continuing education of all persons in the Department and maintenance of quality programs as appropriate."

582. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Provide for the continuing monitoring of professional performance of all individuals in the Department who have delineated clinical privileges."

583. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Maintain continuing review of the professional competence, qualifications, and performance of all Practitioners with clinical privileges and of all Allied Health Professionals with specific services in the Department who provide patient care and report regularly thereon to the President of the Medical Staff and to the Medical Executive Committee."

584. The Department Directors negligently and intentionally failed in these responsibilities as to Dr. Durrani as set forth throughout this Complaint these failures proximately caused harm to Plaintiffs.

585. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Transmit to the appropriate authorities as required by these Bylaws, his or her recommendations concerning appointment and classification, reappointment, delineation of clinical privileges or specific services, and corrective actions with respect to Practitioners in the Department."

586. The Department Directors negligently and intentionally failed in these responsibilities as to Dr. Durrani as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

85

587.    **West Chester/UC Health bylaws for West Chester Medical Center states in**
        **part:** "Enforce the Medical Center and Medical Staff Bylaws, Rules and Regulations
        and policies and procedures of both the Medical Staff and the Department within the
        Department including initiating corrective action and investigation of clinical
        performance and ordering consultations to be provided or to be sought when
        necessary."

588.    The Department Directors negligently and intentionally failed in these
        responsibilities as to Dr. Durrani as set forth throughout this Complaint including the
        failure to properly investigate and ignoring the need for such investigation and taking
        no corrective action against Dr. Durrani, all of which proximately caused harm to
        Plaintiffs.

589.    **West Chester/UC Health bylaws for West Chester Medical Center states in**
        **part:** "Section 4.4 FUNCTIONS OF DEPARTMENTS: The primary responsibility
        delegated to each Department is to implement and conduct specific review and
        evaluation activities that contribute to the preservation and improvement of the
        quality and efficiency of patient care provided in that Department. To carry out this
        responsibility, each Department shall: A) Conduct special studies of care and specific
        monitoring activities, including mortality and surgical case review, for the purpose of
        evaluating clinical work performed under its jurisdiction; B) Recommend guidelines
        to the appropriate committee for the granting of clinical privileges and the
        performance of specified services within the Department; C) Conduct or participate
        in, and make recommendations regarding the need for continuing education programs
        and to findings of review, evaluation and monitoring activities; D) Monitor on a

86

continuing and concurrent basis, adherence to: 1) all applicable Medical Staff and Medical Center policies and procedures 2) requirements for alternate coverage and for consultations; 3) sound principles of clinical practice; E) Coordinate the patient care provided by the Department's appointees with nursing and ancillary patient care services and with administrative support services."

590. The Department Directors negligently and intentionally failed in these responsibilities as to Dr. Durrani as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

591. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Section 5.2 MEDICAL EXECUTIVE COMMITTEE Composition: All Members of the Active Medical Staff are eligible for appointment or election to the Medical Executive Committee. The Medical Executive Committee shall consist of the President of the medical Staff, President-Elect of the medical Staff, immediate Past President of the Medical Chair of the Credentials Committee, Vice President of Medical Affairs, Department Director of Emergency Medicine, Medical Director of Radiology Section, Medical Director of Anesthesia Section, and Four physician members at large who shall be appointed by the President of the Medical Staff. The Senior Vice President, the Chairperson of the Performance Improvement Committee (if that position is held by an individual other than the Past President of the Medical Staff), and such other members of Medical Center administration as are appropriate to the subject matter may be appointed as Ex Officio members of the Medical Staff Shall serve as Chairperson of the Medical Executive Committee."

87

592.   **West Chester/UC Health bylaws for West Chester Medical Center states in**
       **part:** "Duties: The duties of the Medical Executive Committee shall be to: A)
       Receive or act upon reports and recommendations from the Departments,
       Committees, and Officers of the Medical Staff concerning patient care quality and
       appropriateness of reviews, evaluations, and monitoring functions, and the discharge
       of their delegated administrative responsibilities and to recommend to the Board
       specific programs and systems to implement these functions; B) Oversee all activities
       relating to self-governance of the Medical Staff; C) Oversee performance
       improvement initiatives relating to professional services provided by all Practitioners
       and any Allied Health Professional privileged through the Medical Staff Services
       Office; D) Oversee the provision of care, treatment and services to ensure that
       patients with comparable needs receive a comparable standard of care; E) Review,
       act on, where appropriate, and coordinate the activities of and policies adopted by the
       Medical Staff, Departments, and committees; F) Relay (with or without comment)
       recommendations to the Board all matter relating to appointments, reappointments,
       Medical Staff category, Department assignments, Clinical Privileges, corrective
       action, termination of Staff membership and the mechanisms for fair hearing
       procedures: G) Account to the Board and to the Medical Staff for the overall quality
       and efficiency of patient care in the Medical Center and for the medical Staff's
       participation in performance improvement activities including physician peer review;
       H) Take reasonable steps to insure professionally ethical conduct and competent
       clinical performance on the part of the Medical Staff appointees including conducting
       evaluations appropriate to assess the clinical privilege requested, initiating

88

investigations and initiating and pursuing corrective action, when warranted; I) Make recommendations to the Board and administration on a variety of issues including those relating to the structure of the Medical Staff, Medical Staff membership, Medical Staff credentialing and privileging processes, delineations of privilege for each Practitioner, reports of other Medical Staff committees, and policies for organ and tissue procurement and donation; J) Inform the Medical Staff of the accreditation program and the accreditation status of the Medical Center; K) Participate in identifying community health needs and in setting Medical Center goals and implementing programs to meet those needs; L) formulate and/or approve processes to review all requests for Clinical Privileges, medical Staff Rules and Regulations and policies and procedures; and M) Act for the Medical Staff at intervals between Medical Staff meetings, subject to any limitation imposed by the Bylaws or other medical Staff policies and procedures."

593.   The Department Director negligently and intentionally failed in these responsibilities as to Dr. Durrani as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

594.   **West Chester/UC Health bylaws for West Chester Medical Center states in part: "Section 5.3 CREDENTIALS COMMITTEE:** Composition: The Credentials Committee shall be composed of the President-Elect of the Medical Staff, and not less than seven (7) additional voting Members, including at least three Surgical and three medical staff members, and one medical staff member from the Emergency Department, who are appointed by the President of the Medical Staff and subject to the approval of the Board. Voting Members of the Credentials Committee

89

shall be Members of the Active, Courtesy or Affiliate Medical Satff, and are selected

from a variety of Departments and specialties. Other non-physician Members and/or

representatives of Medical Center administration may serve, as appropriate, as Ex

Officio Member of the Credentials Committee."

595.     **West Chester/UC Health bylaws for West Chester Medical Center states in**

**part:** "Duties: The primary duties of the Credentials Committee shall be to A.

investigate the credentials of all initial applicants for appointment and reappointment

to either the Medical Staff or the AHP staff; and B. Make recommendations to the

Board concerning applications for initial appointment, granting of Clinical Privileges,

applications for reappointment, changes in Clinical Privileges, and changes in Staff

category."

596.     The members of the Credentialing Committee failed in their responsibilities as to

Dr. Durrani as described throughout this Complaint and those failures proximately

caused harm to Plaintiffs.

597.     **West Chester/UC Health bylaws for West Chester Medical Center states in**

**part: "Section 7.1 ARTICLE VII - PROCEDURAL RIGHTS: ADVERSE**

**ACTION/RIGHT TO HEARING** By The Medical Executive Committee or the

Board: When a Practitioner receives a recommendation of corrective action that may

adversely impact Clinical Privileges, the Practitioner is entitled to request a hearing

under and subject to the terms of the Fair Hearing Plan of the Medical Center.

**Summary Suspension:** When a Practitioner receives notice that his or her Clinical

Privileges have been summarily suspended pursuant to the Credentials Policy and

90

Procedure manual, the Practitioner shall be entitled to request a hearing under and
subject to the terms of the Fair Hearing Plan of the Medical Center."

598. The Medical Executive Committee negligently and intentionally failed in these
responsibilities as to Dr. Durrani as set forth throughout this Complaint and these
failures proximately caused harm to Plaintiffs.

599. **West Chester/UC Health bylaws for West Chester Medical Center states in
part: "ADVERSE ACTIONS:** Events triggering a right to a hearing are set forth in
the Fair Hearing Plan (Section III of these Bylaws) and shall include: A. denial if
initial staff appointment (except as set forth in the Fair Hearing Plan); B. Denial of
reappointment (except as set forth in the Fair Hearing Plan); C. suspension of staff
appointment; D. revocation of staff appointments; E. suspension of admitting
privileges; F. denial or restriction of requested Clinical Privileges; G. reduction in
Clinical Privileges; H. imposition of a joint admission requirement; I. suspension of
Clinical Privileges; or J. revocation of Clinical Privileges."

600. The Medical Executive Committee negligently and intentionally failed in these
responsibilities as to Dr. Durrani as set forth throughout this Complaint and these
failures proximately caused harm to Plaintiffs.

601. **West Chester/UC Health bylaws for West Chester Medical Center states in
part: "ARTICLE VIII CONFIDENTIALITY, IMMUNITY AND RELEASES
AUTHORIZATIONS AND CONDITIONS:** By submitting an application for
Medical Staff appointment or reappointment, or by applying for or exercising Clinical
Privileges or providing specified patient care services at this medical Center, a
practitioner: A. Authorizes Representatives of the Medical Center and the Medical

91

Staff to solicit, provide and act upon information bearing on his or her professional ability and qualifications; B. Agrees to be bound by the provisions of this Article and to waive all legal and equitable claims against any Representative who acts in accordance with the provisions of this Article; and C. further agrees that he will not seek legal or equitable redress until such time as all administrative remedies provided for in any Medical Staff Policy has been exhausted."

602. Despite having immunity to act, West Chester UC Health negligently and intentionally did not act as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

603. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "Section 8.3 IMMUNITY AND LIABILITY: No Liability for Action Taken:** No Representative of the Medical Center or Medical Staff shall be liable to a Practitioner for damages or other relief for any decision, action, statement or recommendation made within the scope of any appointment, reappointment, credentialing or peer review consideration or decision."

604. Despite having immunity to act, West Chester UC Health negligently and intentionally did not act as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

605. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ARTICLE 3 APPLICATION PROCESS:** Revocation of Privileges: Information as to whether Applicant's staff appointment and/or clinical privileges have ever been terminated (whether voluntarily or involuntarily), denied, revoked, suspended, reduced or not renewed at the Medical Center or at any other healthcare

92

entity, and whether any proceeding is pending or has been instituted which, if decided adversely to Applicant, would result in any of the foregoing."

606. West Chester/UC Health negligently and intentionally ignored the information they knew as to Dr. Durrani as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

607. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Withdrawal of Application: Information as to whether Applicant has ever withdrawn his or her application for appointment, reappointment, or clinical privileges, or resigned from a medical staff before final decision by a healthcare entity's Board."

608. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Professional Sanctions: Information as to whether any of the following have ever been suspended, revoked or denied, restricted or terminated (whether voluntary or involuntary) and whether any proceeding is pending or has been instituted which, if decided adversely to Applicant, would result in any of the following being suspended, revoked or denied restricted or terminate: (1) licensure or registration with any local, state or federal agency or body to practice his or her profession; (2) appointment or fellowship in a local, state or national professional organization; (3) any specialty board certification; or (4) Applicant's narcotics registration certificate."

609. West Chester/UC Health negligently and intentionally ignored the information as to Dr. Durrani as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

93

610. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ARTICLE I CORRECTIVE ACTION- PART B: INDICATORS OF NEED FOR CORRECTIVE ACTION** Corrective action may be indicated whenever a Physician Practitioner exhibits acts, demeanor, or conduct reasonably likely to be (1) detrimental to patient safety or to the delivery of quality patient care within the Medical Center; (2) contrary to the ethics of the profession; (3) contrary to the Medical Staff Bylaws and rules or regulations, Code of Conduct, or the policies and procedures of Medical Center; (4) below applicable professional standards; or (5) disruptive to Medical Center operations or detrimental to the best interests of the Medical Center. In light of the Medical Center's and its Medical Staff's obligations to patients, staff, the community and the medical profession, this requirement to provide information shall be interpreted in favor of prompt, full and frank disclosure."

611. West Chester/UC Health intentionally and negligently failed in these responsibilities as to Dr. Durrani as set forth throughout this Complaint including ignoring Dr. Durrani's demeanor and conduct detrimental to patient safety and quality of patient care; Dr. Durrani's violation of ethics, bylaws, policies and rules, all disrupting the Medical Center and this proximately harm to Plaintiffs.

612. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "The Department Director, or President of the Medical Staff, as the case may be, is expected to exercise reasonable discretion in discreetly and promptly determining whether additional inquiry and/or intervention are necessary. It is the purpose of this policy only to address clinical performance and/or professional

94

conduct issues that potentially place patients at risk or are disruptive to the operations
of the Medical Center."

613.    The Department Director and President of Medical Staff negligently and
        intentionally failed in these responsibilities as to Dr. Durrani as outlined throughout
        this Complaint and these failures proximately caused harm to Plaintiffs.

614.    **West Chester/UC Health bylaws for West Chester Medical Center states in**
        **part:** "A practitioner who fails to promptly report disciplinary or other action taken
        regarding clinical performance or professional conduct in accordance with this policy
        shall be deemed to have failed to fulfill the ongoing conditions of appointment and/or
        reappointment and may be subject to corrective action in accordance with medical
        Center and Medical Staff Bylaws, regulation and policies."

615.    Countless practitioners intentionally and negligently ignored reports to Dr.
        Durrani as set forth throughout this Complaint and these failures proximately caused
        harm to Plaintiffs.

616.    **West Chester/UC Health bylaws for West Chester Medical Center states in**
        **part: "PATIENT RIGHTS/RIGHT TO REFUSE TREATMENT INFORMED**
        **CONSENT** All physicians will comply with medical Center's informed consent
        policies. Any procedure that requires informed consent shall be, absent an emergency,
        performed only after receiving a properly signed informed consent form, which
        contains evidence that the risks, benefits, alternative treatments and risks associated
        with alternative treatments have been discussed with and are understood by the
        patient. Where the patient is a minor, or an adult who lacks legal capacity to offer his
        or her informed consent as result of incompetence or incapacity, the physician may

95

secure informed consent from a person having legal authority to offer such consent on behalf of the patient. The Attending Physician is responsible to ensure that the signed informed consent form and all documentation of the informed consent conversation is properly reflected in the patient's medical record. Procedures that are performed on an emergency basis can be performed without securing informed consent, if, in the opinion of the Attending Physician serious harm to the patient would result from delaying the procedure. All decisions to perform procedures on an emergency basis without the informed consent of the patient shall be documented in the patient's medical record. Additionally, every adult patient having requisite mental capacity shall have the right to permit or refuse treatment."

617.    Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently ignored this requirement as to Plaintiffs set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

618.    **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ARTICLE 5 MEDICAL RECORDS CONTENTS** – The medical record of each patient shall contain at least sufficient information to identify the patient (or a notation of the reason why such information is not available); emergency care provided to the patient before arrival at the Medical Center, and, where appropriate, the times and means of arrival at the Medical Center; symptom/complaint and medical history; a complete history and physical examination with proper authentication; conclusions and impressions draw from the history and physical and an admission diagnosis; a tumor staging form for patients receiving treatment for cancer; any known allergies to food and medication; diagnostic and therapeutic

96

orders; evidence of appropriate informed consent; treatment goals and plan, which is individualized and appropriate to the needs and health status of the patient; evidence of regular review and revisions to the treatment plan; diagnoses and conditions identified during the course of care; all diagnostic and therapeutic order and medications ordered or prescribed; all diagnostic procedures, tests and results; patient response to care, treatment and services; documentation and findings relating to the initial assessment and subsequent reassessments; clinical and consultative observations including results; documentation of complications, Medical Center acquired infections and unfavorable reactions to drugs and anesthesia; acknowledgement of medical Center's advice regarding advance directives and evidence of the advance directives of the patient; procedure and operative reports; discharge diagnoses, a completed and properly authenticated discharge summary; instructions for follow-up care and records of all communication with the patient relating to care, treatment and services; medications prescribed on discharge; the patient's language and communication needs; any electronic patient-generated information; conclusions at the termination of hospitalization or treatment; and any other item deemed necessary by the Attending Physician. All entries in the medical record must be accurate, timely, and legible and should be timed and must be dated and signed. This is to include Physician signatures on verbal orders as well as all other entries in the medical record."

619. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "HISTORY AND PHYSICAL EXAMINATION- Admission History and Physical – A complete history and physical examination (H&P) shall be performed

97

and recorded for each inpatient within twenty-four (24) hours of admission and shall be authenticated by a qualified Physician Practitioner. All entries should be timed and must be dated and signed. The admission H&P must include these elements:"

- Chief Complaint
- Details of Present Illness
- Relevant past, social & family histories
- Inventory of body systems
- Complete physical examination
- Conclusion/Impression drawn from the examination
- Course of action/Treatment plan
- Medical Reconciliation Sheet

620. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Invasive Procedure History and Physical – For individuals undergoing an invasive or operative procedure requiring general anesthesia, deep sedation, or moderate sedation, the medical record must document a current, thorough physical examination prior to the performance of the procedure. The invasive or operative H&P must include these elements:"

- Chief Complaint
- Details of Present Illness
- Relevant past, social & family histories
- Inventory of body systems
- Complete physical examination
- Conclusion/Impression drawn from the examination

98

- Course of action/Treatment plan
- Medical Reconciliation Sheet

621. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "For patients undergoing procedures on an outpatient basis, assessment and documentation of the patient's H&P must be complete within 30 days prior to the procedure. However, in this circumstance, the patient must be re-evaluated the day of the procedure to assess whether or not there has been any substantive change in the patient's condition. Either concurrence with previous findings or changes from previous findings must be documented in the medical record. If the procedure results in the patient being subsequently admitted to the Medical Center, the H&P will, within 24 hours of admission, be expanded to include all elements required for an admission H&P."

622. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Operative reports - A brief operative progress note must be entered in the medical record immediately after invasive and operative procedures. A diagnosis or provisional diagnosis shall be noted in the medical record prior to any procedure."

623. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Operative reports must be dictated or written in the medical record immediately after they are performed and contain a name and a description of the procedure, estimated blood loss, a description of the findings, the technical procedures used, the specimens removed, and the postoperative diagnosis. In every event, the operative report will be completed before the patient is transferred to the next level of care."

99

624. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Post-operative observation notes recording the patient's vital signs, level of consciousness, medications, blood and blood components administered, and notes of any unusual events or complications shall be made appropriate."

625. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Conclusions at the termination of hospitalization (discharge summary) - A discharge summary shall be written or dictated on all medical records of patients hospitalized over forty-eight (48) hours."

626. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "A final progress note may substitute for the discharge summary in all patients with problems of a minor nature who require less than a forty-eight (48) hour period of hospitalization and in the case of a normal newborn infant and uncomplicated obstetrical deliveries."

627. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Discharge notes may be dictated/transcribed by a Licensed Advanced Practitioner acting within the scope of his or her practice as defined by state law and approve Medical Center privileges. Discharge summaries must be countersigned by the Attending Physician Practitioner, or, if applicable, by the responsible CNM."

628. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Authentication - All entries in the medical record must be timed, dated and signed. This is to include authentication of verbal orders and all other entries in the medical record. Authentication means establishment of the identity of the author of the entry by written signature, identifiable initials or computer keys."

100

629.    **West Chester/UC Health bylaws for West Chester Medical Center states in**
        **part:** "The medical record would offer written evidence of the Attending Physician
        Practitioner's involvement in the care of the patient as result of the Physician
        Practitioner's authentication of medical record entries made by house staff. All
        entries made by medical students require the authentication of the supervising
        licensed Physician (Attending or resident). Signature by the responsible Attending
        Physician Practitioner is required on any Operative/Procedure Report or Discharge
        Summary (or Final Progress Notes) dictated/written by a resident. The Attending
        Physician Practitioner may either authenticate the H & P dictated/written by residents
        or write a separate note indication review of the resident's note and agreement or
        exception to the information."

630.    **West Chester/UC Health bylaws for West Chester Medical Center states in**
        **part:** "The medical record should offer further written evidence of the supervising
        Physician Practitioner's involvement in that care of the patient by countersignature of
        entries made by CRNA, and that each collaborating or supervision of each CNM,
        CNP, CNS or PA-C with whom the Physician Practitioner has an agreement.
        Countersignature by collaborating or supervising Physician Practitioner is required to
        the extent required by State law and Medical Center policy for these practitioners."

631.    **West Chester/UC Health bylaws for West Chester Medical Center states in**
        **part:** "Delinquencies and sanctions for incomplete or delinquent records - The
        attending Physicians Practitioner is responsible to ensure that the medical record of
        each patient under his or her carries completed within 30 days after patient discharge.

101

Each Physician Practitioner is expected to regularly log in and monitor delinquency status through electronic medical records."

632.  Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently ignored these record requirements as to Dr. Durrani as set throughout this Complaint and within the Plaintiffs' medical records and these failures proximately caused harm to Plaintiffs.

633.  **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "ARTICLE 6- SURGICAL CARE- Physical facilities - Operating rooms will be assigned to clinical service areas according to patient and procedure volumes."

634.  **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Testing/screening/informed consent for invasive procedures - Physician Practitioners must follow applicable Anesthesia policies regarding testing and screening of patients prior to surgery. Except in the case of an emergency invasive procedure, the Attending Physician shall explain the risks, benefits, sedation necessary, likelihood for blood use, and alternatives available with respect to the procedure, and will secure informed consent for the procedure."

635.  Dr. Durrani, CAST and West Chester/UC Health ignored these record requirements as to Dr. Durrani referenced throughout this Complaint and these failures proximately caused harm to Plaintiffs.

636.  **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Pre-operative verification - Prior to the start of any procedure, a pre-operative verification will be performed. This verification will consist of: (I) a review of the relevant documentation and images of the patient, (ii) a determination that the person

102

on whom the procedure is about to be commenced is the correct patient, (iii) where is appropriate, the licensed independent practitioner responsible for the procedure will review the plan of sedation or anesthesia; and (iv) an evaluation of the condition of the patient before the initiation of moderate or deep sedation or induction of anesthesia.

637.    Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently ignored these responsibility as to Dr. Durrani as set forth throughout this Complaint.

638.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** Surgical scheduling guidelines - non-emergency cases, or elective cases, must be scheduled through Surgical Scheduling. Emergency Cases are scheduled through the OR charge nurse on duty. Where the scheduling of an emergency procedure displaced case will be notified."

639.    Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently ignored these guidelines as to Dr. Durrani as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

640.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "If there are more emergency cases for which booking is requested than available capacity allows, the physician requesting the emergency booking will communicate and work collaboratively to prioritize the appropriate procedure order based on patient acuity. If the physicians requesting the emergency bookings are unable to reach agreement on the appropriate priority, the Department Directors (s) are unable to establish an appropriate procedure order, the issue may be escalated to

103

the President of the Medical Staff, who, in such case, shall have the final decision making authority to establish an appropriate procedure order."

641.  Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently ignored these scheduling requirements as to Dr. Durrani as set throughout this Complaint and these failures proximately caused harm to Plaintiffs.

642.  **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical record of anesthesia and operative report - The medical record of any patient undergoing an operative or other high-risk procedure where moderate or deep sedation or anesthesia is administered shall thoroughly document the appropriate information relating to the procedure. A diagnosis provisional diagnosis is shall be noted in the medical record prior to the procedure. Procedure reports or progress notes relating to operative or other high risk procedures shall be dictated or written immediately, but shall in every event be completed before the patient is transferred to the next level of care. For any invasive procedure, a written or dictated note should be made in the patient's medical record indicating whether a general or local anesthesia is used. The Attending Physician is required to dictate his or her "Report of Operation" as soon as possible, but o later than 72 hours after the conclusion of the procedure. The general operative record should include the names of all licensed independent practitioners and other health care personnel participating in the procedure, the name and a post-operative diagnosis, and shall be authenticated and made available in the patient's medical record as soon as possible."

ELECTRONICALLY FILED 10/31/2013 11:44 / IFOJ / A 1307306 / CONFIRMATION NUMBER 291177

643.    Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently
        ignored the requirements as to Dr. Durrani set forth in throughout this Complaint and
        these failures proximately caused harm to Plaintiffs.

644.    **West Chester/UC Health bylaws for West Chester Medical Center states in
        part:** "Post-operative care notes - Post-operative observation notes recording the
        patient's vital signs, level of consciousness, medications, blood and blood
        components administered, and notes of any unusual events or complications shall be
        made appropriate."

645.    Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently
        ignored these record requirements as to Dr. Durrani set forth throughout this
        Complaintthese failures proximately caused harm to Plaintiffs.

646.    **West Chester/UC Health bylaws for West Chester Medical Center states in
        part: "ARTICLE 9:  GENERAL RULES REGARDING PRACTICE IN THE
        MEDICAL CENTER** Research conducted on Human Subjects - All proposals for
        search involving human subjects, whether sponsored or non-sponsored, shall be
        conducted in a manner that minimizes risks to the welfare, health and safety of the
        study participants. Patient's rights, including the right of privacy, shall be preserved,
        and an informed consent form shall be obtained from the patient, or his or her
        authorized representative, prior to such participation. The Institutional Review Board
        of the University of Cincinnati ("Review Board") shall oversee all research on human
        subjects conducted at the Medical Center by any member of: the Medical Staff,
        nursing staff, Allied Health Staff, or Medical Center administration. The Review
        Board shall evaluate, make recommendations, approve, monitor, maintain records,

105

and report in the requested or actual use, if approves, of investigational new drugs, medical devices and treatment protocols to be administered to patients of the Medical Center. Review Board activities shall be governed under the Multiple Project Assurance of Compliance with the Department of Health and Human Services regulations for the protection of human subjects or research."

647.    Dr. Durrani, CAST and West Chester/UC Health intentionally and negligently ignored these research requirements as to Dr. Durrani as set forth throughout this Complaint and these failures proximately caused harm to Plaintiffs.

648.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "The senior Vice President is responsible for the appointment of members of the Review Board and the oversight of the Review Board. The Medical Center may not approve research covered under this policy if it has not been approved by the Review Board, however, the hospital administration may decline to conduct research previously approved by the Review board. Investigators may not begin research involving human subjects until the Review Board has approved the study or has determined that it is exempt."

649.    Dr. Durrani, CAST and West Chester/UC Health intentionally and intentionally ignored these research requirements as set forth to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

650.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Policies and procedures - All physicians will comply with all Medical Center policies applicable to physicians. This shall include, but not be limited to, policies regarding harassment and disruptive conduct of medical staff members."

106

651.    The West Chester Medical Center Policy and Procedure Manual in its Informed

Consent section states in part:

    a.    (1) No examination or treatment may commence without the informed

        consent of the patient or the patient's legally authorized representative; (2)

        the principle of informed consent is based on the individual's right to privacy

        and self-determination which includes the right to make informed, reasoned

        decision concerning one's physical and mental well-being; (3) it is the

        responsibility of the physician to obtain informed consent; (4) the nurse may

        witness the signature of the patient on the Acknowledgement of Informed

        Consent form if the patient verbalizes an understanding of the procedure,

        risks, benefits, and alternatives as explained by the physician.

    b.    It is the responsibility of the attending physician to obtain informed consent

        prior to the procedure. The patient, or his/her representative will be advised

        by his/her physician of: (a) explanation of the procedure, (b) the benefits of

        the procedure, (c) the potential problems that might occur during

        recuperation, (d) the risks and side effects of the procedure which include but

        are not limited to severe blood loss, infection, stroke or death, (e) the

        benefits, risks and side effect of alternative procedures including the

        consequences of declining this procedure or any alternative procedures, (f)

        the likelihood of achieving satisfactory results.

    c.    The patient's consent must be documented for: (a) surgical procedures and

        invasive procedures, (b) medical regimens of substantial risk or that are the

107

subject of human investigations or research must be in writing, and signed and dated by the patient or his/her authorized representative.

    d.  Completion of the "Consent to Hospital and Medical Treatment" form to examine and treat is NOT sufficient as consent to perform a surgical procedure, invasive procedure, or for medical regimens of substantial risk or that are the subject of human investigation or research.

652.    Dr. Durrani, CAST and West Chester/UC Health ignored these informed consent requirements including proper documentation of informed consent to the surgeries performed by Dr. Durrani.

653.    West Chester/UC Health Policy # OR 4.05 states in part: "All visitors and vendors are documented in the medical record. The documentation includes name and title." This would include David Rattigan of Bahler and Medtronic.

654.    West Chester/UC Health Policy # OR 4.02 under Section III states in part: "Emergent surgery: An emergent case necessitates immediate action to minimize any threat to life, limb or organ."

655.    Under # OR 4.02 Section IV(A) states in part: "When a surgical case is in imminent emergent need, the surgeon will communicate directly to Operating Room (OR) Operations Coordinator or Charge Nurse.

656.    The provider application Dr. Durrani was asked to complete under Section 7 requests a Work History and References. Dr. Durrani both lied on the history under "reason for departure" and his references were individuals who knew the real reason and despite being part of the West Chester Medical Staff at the time misrepresented, concealed and ignored the reasons in assisting Dr. Durrani from obtaining privileges.

108

657.    In addition, under Section 8, the application asks:

"Has your license, registration or certification to practice in your profession, ever

been voluntarily or involuntarily relinquished, denied, suspended, revoked,

restricted, or have you ever been subject to a fine, reprimand, consent order,

probation or any conditions or limitations by any state or professional licensing,

registration or certification board?"

"Have your clinical privileges or medical staff membership at any hospital or

healthcare institution, voluntarily or involuntarily, ever been denied, suspended,

revoked, restricted, denied renewal or subject to probationary or to other

disciplinary conditions (for reasons other than non-completion of medical record

when quality of care was not adversely affected) or have proceedings toward any

of those ends been instituted or recommended by any hospital or healthcare

institution, medical staff or committee, or governing board?"

Have you ever terminated for cause or not renewed for cause from participation,

or been subject to any disciplinary action, by any managed care organizations

(including HMOs, PPOs, or provider organizations such as IPAs, PHO's?"

658.    Dr. Durrani certified all the information provided in his application is "current,

true, correct, accurate and complete" despite clear evidence to the contrary.

659.    Dr. Durrani, CAST and West Chester/UC Health ignored these requirements as to

Dr. Durrani as set forth throughout this Complaint and these failures proximately

caused harm to Plaintiffs.

109

660.    The collective failure of West Chester and UC Health in abiding by and enforcing
their own bylaws all support negligence directly against them as well as negligent
hiring, retention, supervision and credentialing with respect to Dr. Durrani.

## COUNT I: NEGLIGENCE- ALL DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading
and is readily apparent when it is.)**

661.    Plaintiffs adopt and incorporate herein by reference each and every prior
paragraph in this pleading.

662.    Dr. Durrani, acting individually and through CAST, deviated from the standard of
care for a spine surgeon by failing to exercise the skill, care and diligence of a spine
surgeon under like or similar circumstances in his treatment of Plaintiffs and that
deviation proximately caused harm to Plaintiffs as detailed in Plaintiffs Complaint.

663.    CAST's, Children's, UC Health's and West Chester Hospital's Board, their
management, staff, employees, nurses, technicians and agents, all during the scope of
their employment and/or agency owed Plaintiffs the duty to exercise the degree of
skill, care, and diligence of an ordinary prudent health care provider and hospital
would have exercised under like or similar circumstances as detailed in the Plaintiffs'
Complaint and they breached their duty. The breach proximately caused harm to
Plaintiffs, as detailed in this pleading and is reaffirmed here.

664.    CAST's, Children's, UC Health's and West Chester Hospital's management,
staff, employees, nurses, technicians and agents, all during the scope of their
employment and/or agency as identified in each of Plaintiffs medical records, and
with the full blessing of the Board, knowingly and/or negligently, as reflected in each

110

Plaintiff's admission, pre-op, operative, post op and discharge records, participated and assisted Dr. Durrani in the surgery and committed the following malpractice by breaching their duty as follows:

G. Negligently screened Plaintiff for surgery.

H. Negligently approved Plaintiff for the surgery.

I. Negligently admitted Plaintiff for surgery.

J. Negligently allowed Plaintiff to be placed under general anesthesia.

K. Negligently documented the surgical procedure.

L. Negligently failed to obtain informed consent.

665. The basis for the allegation of A-F above is the management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of CAST's, Children's, UC Health's and West Chester Hospital's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of CAST as described in detail in this pleading.

666. All the aforementioned paragraphs are referenced and incorporated herein, but in addition, CAST's, Children's, UC Health's and West Chester Hospital's board, managers, supervisors, representatives, employees, nurses, technicians, staff, agents all during the scope of their employment and/or agency knew BMP-2 should not have been used, yet assisted Dr. Durrani in its use. They logged it. They touched it. They assisted in its placement.

111

667.    CAST's, Children's, UC Health's and West Chester Hospital's management, staff, employees, nurses, technicians, agents and representatives should have refused to assist Dr. Durrani in these procedures; they should have stopped Dr. Durrani from doing these procedures; they should have gotten Dr. Durrani's dog the hell out of the surgical suite.

668.    No one, including Defendants, can escape culpability and liability simply by remaining silent like sheep for shepherds who our fools.

669.    As a direct and proximate result of these Defendants' acts and omissions by and through its agents and/or employees, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT II: NEGLIGENT HIRING, RETENTION, CREDENTIALING, & SUPERVISION- ALL DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

670.    Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

671.    CAST, Children's, UC Health and West Chester Hospital provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

672.    CAST, Children's, UC Health and West Chester Hospital and Dr. Durrani participated in experiments using BMP-2 bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiffs.

112

673.    CAST, Children's, UC Health and West Chester Hospital breached their duty to Plaintiffs, inter alia, by not controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at Defendant facilities.

674.    As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by the residents, doctors, nurses, and those with privileges by Defendant facilities, Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT III: BATTERY – DR. DURRANI

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

675.    Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

676.    Dr. Durrani committed battery against Plaintiffs by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to the Plaintiffs.

677.    Plaintiffs would not have agreed to the surgeries if they knew that the surgeries were unnecessary, not approved by the FDA, and not indicated.

113

678.    As a direct and proximate result of the aforementioned battery by Dr. Durrani,

Plaintiffs sustained severe and grievous injuries, prolonged pain and suffering,

emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the

ability to perform usual and customary activities, and incurred substantial medical

expenses and treatment.

## COUNT IV: FRAUD – ALL DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading
and is readily apparent when it is.)**

679.    Plaintiffs adopt and incorporate herein by reference each and every prior

paragraph in this pleading.

680.    Defendants made material, false representations to Plaintiffs and their insurance

company related to Plaintiffs' treatment including: stating the surgeries were

necessary, that Dr. Durrani "could fix" Plaintiffs, that more conservative treatment

was unnecessary and futile, that the surgery would be simple or was "no big deal",

that Plaintiffs would be walking normally within days after each surgery, that the

procedures were medically necessary and accurately reported on the billing to the

insurance company, that the surgery was successful, that "I will fix you", that

Plaintiffs were medically stable and ready to be discharged.

681.    Defendants knew or should have known such representations were false, and/or

made the misrepresentations with utter disregard and recklessness as to their truth that

knowledge of their falsity may be inferred.

682.    Dr. Durrani manipulated his diagnosis and the medical tests to recommend

surgery that he knew was not indicated.

114

683.    Dr. Durrani was operating a scam in which he would receive referrals through the facility and the medical community, conduct experiments on behalf of Medtronic using their products, and perform those surgeries on whomever his patients were regardless of medical need all with the full knowledge of Defendants.

684.    Defendants made the misrepresentations both before and after the surgeries with the intent of misleading the insurance company and the Plaintiffs into reliance upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

685.    The Plaintiffs were justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust them.

686.    There is no expectation that a doctor will have so compromised his/her medical judgment as to endanger their patients in experimental and unnecessary surgeries such that the patient should have a duty to engage in an in-depth investigation of the doctor to ensure their medical judgment is not so compromised.

687.    The Plaintiffs relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at their health care facility as assurance the facility was overseeing Dr. Durrani and vouching for his surgical abilities.

688.    The facility expected this reliance and requires patients to trust the facility to only allow surgeons who are competent and trustworthy to perform surgeries there.

ELECTRONICALLY FILED 10/31/2013 11:44 / IFOJ / A 1307306 / CONFIRMATION NUMBER 291177

689. The insurance company of Plaintiffs justifiably relied on the misrepresentations in the billing documents they received because it would be so reckless for a facility to have no safeguards to protect its patients from such flagrant fraud and abuse from their doctors that it would be unreasonable for the insurance company to foresee the possibility.

690. Dr. Durrani's scheme required the cooperation, either through complicity or through affirmative support, of the facilities including West Chester/UC Health at which he operated; they either had to turn a blind eye to what was happening or take steps to support it, and otherwise it would have been impossible for Dr. Durrani to do this.

691. The billing sent by Defendants to Plaintiffs is false.

692. All billing related to Dr. Durrani's unnecessary surgeries to Plaintiffs should never have been sent.

693. As a direct and proximate result of the aforementioned fraud, Plaintiffs did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered severe and grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT V: INTENTIONAL INFLICATION OF EMOTIONAL DISTRESS- DR. DURRANI

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

116

694.    Plaintiffs adopt and incorporate herein by reference each and every prior
paragraph in this pleading.

695.    Dr. Durrani's conduct is so outrageous and it was the proximate and actual cause
of the Plaintiffs' psychological injuries, emotional injuries, mental anguish, suffering,
and distress.

696.    The Plaintiffs suffered distress and anguish so serious and of a nature that no
reasonable man or woman would be expected to endure.

## COUNT VI– INFORMED CONSENT- ALL DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading
and is readily apparent when it is.)**

697.    Plaintiffs adopt and incorporate herein by reference each and every prior
paragraph in this pleading.

698.    The informed consent forms from Defendants which they required Plaintiff to
sign failed to fully cover all the information necessary and required for the procedures
and surgical procedures performed by Dr. Durrani and Defendant's facilities.  Dr.
Durrani and CAST each required an informed consent release.

699.    In addition, none of the Defendants or their agents, employees or representatives
verbally informed Plaintiffs of the information and risks required for informed
consent.

700.    Defendant Hospitals knew they have the responsibility to inform because
Defendant Hospitals required a signed consent form.

701.    Defendants had a duty to inform Plaintiffs of material risks and dangers inherent
or potentially involved in all surgeries and procedures.

117

702. Defendants failed to inform Plaintiffs of the material risks and dangers inherent or potentially involved in the procedures performed.

703. Plaintiffs subsequently developed severe and grievous injuries as a direct and proximate result of lack of informed consent, and other acts and omissions as outlined in this Complaint.

704. Had Plaintiffs been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiffs would not have undergone the surgery or procedures.

## COUNT VII- OHIO CONSUMER SALES PROTECTION ACT- CORPORATE DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

705. Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

706. The Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians.

707. It should not exempt physicians, but it does.

708. However, a transaction between a hospital and a patient/consumer is not clearly exempted.

709. Defendant hospital services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

118

710.    Defendant hospitals omitted suppressed and concealed from Plaintiffs facts with

the intent that Plaintiffs rely on these omissions, suppressions and concealments as set

forth herein.

711.    Defendants' misrepresentations, and its omissions, suppressions and

concealments of fact, as described above, constituted unfair, deceptive and

unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to

Substantive Rules and case law.

712.    Defendants were fully aware of its actions.

713.    Defendants were fully aware that Plaintiffs were induced by and relied upon

Defendants' representations at the time Defendants were engaged by Plaintiffs.

714.    Had Plaintiffs been aware that Defendants' representations as set forth above

were untrue; Plaintiffs would not have used the services of Defendants.

715.    Defendants, through its agency and employees knowingly committed the unfair,

deceptive and/or unconscionable acts and practices described above.

716.    Defendants' actions were not the result of any bona fide errors.

717.    As a result of Defendants' unfair, deceptive and unconscionable acts and

practices, Plaintiffs have suffered and continues to suffer damages, which include, but

are not limited to the following:

     a.    Loss of money paid

     b.    Severe aggravation and inconveniences

     636. Under O.R.C. 1345.01 Plaintiffs are entitled to:

ELECTRONICALLY FILED 10/31/2013 11:44 / IFOJ / A 1307306 / CONFIRMATION NUMBER 291177

    i.  An order requiring Defendants restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

    ii.  All incidental and consequential damages incurred by Plaintiff;

    iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

    iv.  Such other and further relief that this Court deems just and appropriate.

## COUNT VIII FALSIFICATION, ALTERING RECORDS AND SPOILATION OF EVIDENCE- ALL DEFENDANTS

**(This is not meant to be an exclusive list. This claim is pled throughout this pleading and is readily apparent when it is.)**

718.    Plaintiffs adopt and incorporate herein by reference each and every prior paragraph in this pleading.

719.    Each of the Defendants altered documents, including medical records to further their schemes including the delay in the production of records to allow records to be "cleansed."

720.    Patients, including Plaintiffs, have not been able to obtain their medical records from Dr. Durrani.

721.    Patients, including Plaintiffs have not been able to obtain their implant logs and intra-operative reports.

722.    As outlined in this Complaint, there were countless falsification of records.

120

723.    All Defendants failed to abide by and comply with Plaintiffs preservation of evidence and electronic email.

724.    All Defendants destroyed and altered records.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request and seek justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.    Past medical bills;

2.    Future medical bills;

3.    Lost income and benefits;

4.    Lost future income and benefits;

5.    Loss of ability to earn income;

6.    Past pain and suffering;

7.    Future pain and suffering;

8.    Plaintiffs seek a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.    All incidental costs and expenses incurred as a result of their injuries;

10.    The damages to their credit as a result of their injuries;

11.    Loss of consortium;

12.    Punitive damages;

13.    Costs;

14.    Attorneys' fees;

15.    Interest;

16.    All property loss;

121

17.    All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiffs seek in excess of $25,000.

18.    Incarceration of Defendants;

19.    The License of Defendants;

20.    An apology;

Respectfully Submitted,

/s/ Eric C. Deters
Eric C. Deters (# 38050)
Attorney for Plaintiff
5247 Madison Pike
Independence, KY 41051
859-363-1900 Fax: 859-363-1444
eric@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

/s/ Eric C. Deters
Eric C. Deters

122

**IN THE COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **HEATHER PICKETT, et al.** | : | |
| | : | |
| | : | **Case No.** |
| **PLAINTIFFS** | : | |
| | : | **Judge** |
| **V.** | : | |
| | : | **PLAINTIFFS' FIRST SET** |
| **ATIQ DURRANI, M.D., et al.** | : | **OF INTERROROGATORIES** |
| | : | **AND REQUEST FOR** |
| | : | **PRODUCTION OF** |
| **DEFENDANTS** | : | **DOCUMENTS AND REQUESTS** |
| | : | **FOR ADMISSIONS DIRECTED** |
| | : | **TO ALL DEFENDANTS** |
| | : | |

Pursuant to Rules 26 and 33 of the Ohio Rules of Civil Procedure, you shall answer each of the following interrogatories under oath, in writing, separately, in the fullest detail possible, and in accordance with the definitions and instructions set forth below. The answers shall be signed by the persons making them, and a copy of your answers, together with your objections, if any, shall be served no later than 28 days after the service of these interrogatories.

Please take notice that pursuant to the Ohio Rules of Civil Procedure, the following requests propounded to the Defendants by the Plaintiffs are to be answered by the Defendant under oath, in writing, separately and fully and said sworn answers are to be served upon the undersigned within 28 days of service hereof. Should Defendant fail to respond in writing within 28 days, the Requests for Admissions shall be deemed admitted pursuant to Civil Rule 36. This discovery is continuing in nature so as to require supplementary answers if you obtain further or different information prior to trial.

1

If a particular Interrogatory, Request for Production or Request for Admission does not pertain to your client, then simply state so, and set forth the reasoning for why it does not pertain to your client.

## INSTRUCTIONS FOR ANSWERING

All information is to be divulged which is in your possession or control, or within the possession or control of your attorney or any other person acting on your behalf. When an interrogatory calls for an answer in more than one part, each part should be separated so that the answer to each part is clearly understandable. All answers must be made separately.

Furthermore, you are under a duty to seasonably supplement your response with respect to any interrogatory directly addressed to (1) the identity and locations of persons having knowledge of discoverable matters, and (2) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony. In addition, you are under a duty to amend a prior response if you obtain information on the basis of which you know that the response was incorrect when made, or that the response, though correct when made, is no longer true, and the circumstances are such that a failure to amend the response is, in substance, a knowing concealment.

As used herein, the terms "you", "your", or "yourself" refer to the defendants, each of their present officers, employees, agents, representatives, and attorneys, and each persona acting or purporting to act in its behalf.

As used herein, the term "representative" means any and all agents, employees, servants, officers, directors, attorneys, or other persons acting or purporting to act on behalf of the person in question.

2

As used herein, the term "person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, and other units therein, and shall include, but not be limited to, a public or private corporation, partnership, joint venture, voluntary or unincorporated association, organization, trust, estate, governmental agency, commission, bureau, or department.

As used herein, the term "document" means any medium upon which intelligence or information can be recorded or retrieved, and includes, without limitation, the original and each copy, regardless of origin or location, of any book, pamphlet, periodical, letter, memorandum (including any memorandum of a meeting or conversation), invoice, bill, order form, receipt, financial statement, accounting entry, diary, calendar, telex, telegram, cable, report, record, contract, agreement, study, handwritten note, draft, working paper, chart, paper, print, laboratory record, drawing, sketch, graph, index, list, tape, photograph, microfilm, data sheet or data processing card, magnetic data processing medium, email, electronic document, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced, which is in your possession, custody, or control, or which was, but is no longer, in your possession, custody, or control.

As used herein, the term "communication" means any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomever made, including, but not limited to, correspondence, conversations, dialogues, discussions, emails, interviews, consultations, agreements, and other understandings between or among two or more persons.

As used herein, the terms "identification", "identify", or "identity", when used in reference to (a) a natural individual, require you to state his or her full name, date of birth, social security number, and residential and business address; (b) a corporation, require you to state its

3

full corporate name and any names under which it does business, its date and state of incorporation, the address of its principle place of business, and the address of its offices in Ohio; (c) a business, require you to state the full name or style under which the business is conducted, its business address or addresses, the types of business in which it is engaged, the geographic areas in which it conducts those businesses, and the identity of the person or persons who own, operate, and control the business; (d) a document, require you to state the number of pages and the nature of the document (e.g., letter or memorandum), its title, its date, the name or names of its authors and recipients, and its present location and custodian; (e) a communication, require you, if any part of the communication was written, to identify the document or documents which refer to or evidence the communication, and, to the extent that the communication was non-written, to identify the persons participating in the communication and to state the date, manner, place, and substance of the communication; (f) any natural person who at any time was employed by any of the defendants herein, require you to state his or her full name, residential and business address, his dates of employment (including his hire date and, if applicable, his termination date), and his date of birth.

With respect to each interrogatory, in addition to supplying the information requested, you are to identify all documents that support, refer to, or evidence the subject matter of each interrogatory and your answer thereto.

If any or all documents identified herein are no longer in your possession, custody, or control because of destruction, loss, or any other reason, then do the following with respect to each and every such document: (a) describe the nature of the document (e.g., letter or memorandum); (b) state the date of the document; (c) identify the persons who sent and received

4

the original and a copy of the document; (d) state in as much detail as possible the contents of the document; and (e) state the manner and date of disposition of the document.

If you contend that you are entitled to withhold from production any or all documents identified herein on any ground, then do the following with respect to each and every document: (a) describe the nature of the document (e.g., letter or memorandum); (b) state the date of the document; (c) identify the persons who sent and received the original and a copy of the document; (d) state the subject matter of the document; and (e) state the basis upon which you contend you are entitled to withhold the document from production.

As used herein the word "or" appearing in an interrogatory should not be read so as to eliminate any part of the interrogatory, but, whenever applicable, it should have the same meaning as the word "and." For example, an interrogatory stating "support or refer" should be read as "support and refer" if an answer that does both can be made.

## INTERROGATORIES

1. Please identify yourself and identify each and every person with whom you have consulted, upon whom you have relied, or who otherwise constituted a source of information for you in connection with the preparation of your answers to these interrogatories, listing with respect to each and every such person the number(s) of interrogatories to which he or she helped to prepare answers or with respect to which he or she was consulted, relied upon, or otherwise constituted a source of information.

2. Identify every document or communication which you consulted, upon which you relied, or which otherwise constituted a source of information for you in connection with the preparation of your answers to these interrogatories.

5

3. Identify every document or communication in your possession, or known or believed to be possessed by a third party which is relevant to the subject matter of this action.

4. Identify all exhibits and demonstrative exhibits you will attempt to introduce at the trial of this matter. We will not ask again. Subject to any scheduling order, we expect timely disclosure before trial or we will file a Motion in Limine to exclude those exhibits not timely disclosed.

5. Identify all lay witnesses which will testify at the trial of this matter. Subject to any scheduling order, we expect timely disclosure before trial or we will file a Motion in Limine to exclude those witnesses you do not timely disclose.

6. With respect to each and every expert whom you expect to call as an expert witness at trial, do the following:
   a. identify him or her;
   b. a detailed description of what the expert's testimony will be in this case pertaining to standard of care, causation and damages and what he bases those opinions on;
   c. disclose the expert's CV;
   d. state what details of Dr. Durrani's pending criminal charges you have shared with this expert;
   e. disclose a written index of all documentation, literature, medical records, medical bills and radiology this expert has reviewed;
   f. disclose a copy of all written email correspondence between you and your firm and your expert to date including any supplements through the trial of this matter;
   g. disclose the free agreement that this expert has agreed to;
   h. Subject to any scheduling order, we expect timely disclosures before trial or we will file a Motion in Limine to exclude those experts.

6

7. Identify each and every person known or believed by you to have knowledge relevant to the subject matter of this action. With respect to each such person, specifically describe the knowledge you know or believe that person has relevant to the subject matter of this action.

8. Identify any felony convictions or crimes of dishonesty of any person lay or expert witness. For purposes of this Interrogatory a "crime of dishonesty" is defined under the Ohio Rules of Evidence and the applicable case law thereto.

9. List all policies of insurance and the amounts of their coverage that were in force which covered Defendant for any acts of negligence while on premises controlled by Defendant. Also include any excess coverage or umbrella policies that were in existence at that time on Defendant. This interrogatory relates to the subject matter of this litigation.

10. Have you ever been named as a defendant in a lawsuit arising from alleged malpractice or professional negligence? If so, state the court, the caption and the case number for each lawsuit.

11. Have you ever testified in court in a medical malpractice case? If so, state the court, caption and case number of each such case, the approximate date of your testimony, whether you testified as a treating physician or expert and whether you testified on your own behalf or on behalf of the defendant or plaintiff.

12. Has your license to practice medicine ever been suspended or has any disciplinary action ever been taken against you in reference to your license? If so, state the specific disciplinary action taken, the date of the disciplinary action, the reason for the

7

disciplinary action, the period of time for which the disciplinary action was effective and the name and address of the disciplinary entity taking the action.

13. State the exact dates and places at which you saw the plaintiff for the purposes of providing care or treatment.

14. State the name, author, publisher, title, date of publication and specific provision of all medical texts, books, journals or other medical literature which you or your attorney intend to use as authority or reference in defending any of the allegation set forth in the complaint. Subject to any scheduling order, we expect timely disclosures before trial or we will file a Motion in Limine to exclude these references.

15. Have you ever been denied admission to or suspended from a hospital staff? If so, provide details for the basis of the denial or suspension and all documents related to the denial or suspension.

16. State in detail every fact upon which you contend that the Plaintiff's surgery (or surgeries), was/were medically necessary and conformed to the applicable standard of care.

17. State in detail every fact upon which you contend that the Plaintiff's informed consent was obtained for the use of Infuse/BMP-2 "off-label" in his or her surgery(ies).

8

18. If Defendant contends that Plaintiff caused or contributed to her own injuries, state each and every fact and detail in which Defendant contends Plaintiff caused or contributed to his or her own injuries, what evidence will be introduced to support such contention, including what witnesses will be called and a summary of their testimony on this issue.

19. If Defendant contends that Plaintiff assumed the risks inherent with his or her actions and/or inactions, please state each and every fact and detail that supports such contention, and state what evidence will be introduced to support such contentions, including what witnesses will be called and a summary of their testimony on this issue.

20. If Defendant contends that Plaintiff failed to mitigate his or her damages, please state each and every fact and detail that supports such contention, and state what evidence will be introduced to support such contention, including what witnesses will be called and a summary of their testimony on this issue.

21. State your Ohio state medical license number, your state medical license number for any state you have ever been licensed, your Social Security number and date of birth.

ELECTRONICALLY FILED 10/31/2013 11:44 / IFOJ / A 1307306 / CONFIRMATION NUMBER 291177

## DOCUMENTS AND THINGS REQUESTED

1. Produce every document or communication which you consulted, upon which you relied, or which otherwise constituted a source of information for you in connection with the preparation of your answers to these interrogatories.

2. Produce every document or communication in your possession, or known or believed to be possessed by a third party which is relevant to the subject matter of this action.

3. Produce all exhibits and demonstrative exhibits you will attempt to introduce at the trial of this matter. We will not ask again. Subject to any scheduling order, we expect timely disclosure before trial or we will file a Motion in Limine to exclude those exhibits not timely disclosed.

4. With respect to each and every expert whom you expect to call as an expert witness at trial, do the following:
   a. Produce the expert's CV;
   b. Produce a written index of all documentation, literature, medical records, medical bills and radiology this expert has reviewed;
   c. Produce a copy of all written email correspondence between you and your firm and your expert to date including any supplements through the trial of this matter;
   d. Produce the free agreement that this expert has agreed to;
   e. Subject to any scheduling order, we expect timely disclosures before trial or we will file a Motion in Limine to exclude those experts.

5. Produce all policies of insurance and the amounts of their coverage that were in force which covered Defendant for any acts of negligence while on premises controlled by Defendant. Also include any excess coverage or umbrella policies that were in existence at that time on Defendant. This interrogatory relates to the subject matter of this litigation.

10

6. Produce copies of the references the publications and specific provision of all medical texts, books, journals or other medical literature which you or your attorney intend to use as authority or reference in defending any of the allegation set forth in the complaint. Subject to any scheduling order, we expect timely disclosures before trial or we will file a Motion in Limine to exclude these references.

7. Produce all documents or communications that provide details for the basis of the denial or suspension of hospital privileges.

8. If Defendant contends that Plaintiff caused or contributed to her own injuries, state each and every fact and detail in which Defendant contends Plaintiff caused or contributed to his or her own injuries, what evidence will be introduced to support such contention, including what witnesses will be called and a summary of their testimony on this issue. In addition, produce all associated documents or communications which support such a contention.

9. If Defendant contends that Plaintiff assumed the risks inherent with his or her actions and/or inactions, please state each and every fact and detail that supports such contention, and state what evidence will be introduced to support such contentions, including what witnesses will be called and a summary of their testimony on this issue. In addition, produce all associated documents or communications which support such a contention.

10. If Defendant contends that Plaintiff failed to mitigate his or her damages, please state each and every fact and detail that supports such contention, and state what evidence will be introduced to support such contention, including what witnesses will be called and a

11

summary of their testimony on this issue. In addition, produce all associated documents or communications which support such a contention.

11. Please include current curriculum vitae (CV) or resume describing your education, practice experiences and/or research experiences.

12. Produce all photographs which were taken prior to, at the time of, or subsequent to the Defendants' treatment of Plaintiff.

13. Produce all transcripts of all recorded statements that were taken from the Plaintiff.

14. Produce all items that will be listed in Defendant's answers to interrogatories propounded to Defendant

15. Produce copies of any and all notices, investigative reports, memoranda, correspondence or statements now in your representative's or your insurance carrier's possession, regarding the Plaintiff's treatment, including items obtained prior to this lawsuit and items prepared in the ordinary course of business. This request specifically includes, but is not limited to, statement and/or reports made regarding the incident that serves as the subject matter of this action. This request is not intended to produce attorney work-product, only documents and communications created prior to the Defendant's representation by his attorney on this particular case.

12

## REQUESTS FOR ADMISSIONS

1. Admit that St. Elizabeth Medical Center, Inc. denied you staff privileges when you applied at St. Elizabeth.

2. Admit that your staff privileges at Cincinnati Children's Hospital were terminated.

3. Admit that your staff privileges at Christ Hospital were terminated.

4. Admit that your staff privileges at Deaconess Hospital were terminated.

5. Admit that Infuse/BMP-2 was placed inside Ms. Pickett during her January 2006 procedure.

6. Admit that you used Baxano on Ms. Pickett on December 3, 2012.

7. Admit that Ms. Pickett was 16 years old at the time of her January 2006 surgery.

13

8. Admit that Ms. Pickett can now barely walk.

9. Admit that you informed Ms. Pickett or her parents that the leg swelling she experienced and continues to experience was "normal."

Respectfully Submitted,

_/s/_ Eric C. Deters
Eric C. Deters (0038050)
Eric C. Deters & Partners, P.S.C.
5247 Madison Pike
Independence, KY 41051
(859) 363-1900        Fax: (859) 363-1444
Email: eric@ericdeters.com
*Attorney for Plaintiffs*

14

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was attached to the Complaint and served this 31st day of October on all Defendants.

/s/ Eric C. Deters
Eric C. Deters

15

ELECTRONICALLY FILED 10/31/2013 11:44  /  IFOJ  /  A 1307306  /  CONFIRMATION NUMBER 291177

**IN THE COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**
**CIVIL DIVISION**

|                                          |   |                                                                  |
|------------------------------------------|---|------------------------------------------------------------------|
| Heather Pickett,                         | : |                                                                  |
|                                          | : | Case No.                                                         |
|                                          | : |                                                                  |
| Plaintiff                                | : | Judge                                                            |
|                                          | : |                                                                  |
|                                          | : |                                                                  |
| v.                                       | : | **MOTION FOR EXTENSION OF TIME**                                 |
|                                          | : | **TO FILE AFFIDAVIT OF MERIT**                                   |
|                                          | : |                                                                  |
| ABUBAKAR ATIQ DURRANI, M.D., et al :     |   |                                                                  |
|                                          | : |                                                                  |
|                                          | : |                                                                  |
| Defendants.                              | : |                                                                  |

Come now the Plaintiffs through Counsel, and file this Motion for an Extension of Time for 90 days to file an Affidavit of Merit in support of Plaintiff's medical negligence claim.

Notably, Plaintiff's claims related to fraud,, battery, and intentional infliction of emotional distress do not require an affidavit of merit.

Furthermore, this case was filed, inter alia, to preserve all applicable statutes of limitation. Therefore, the Plaintiff respectfully requests a brief opportunity to acquire all relevant medical records, billing, and radiology imaging files, and have Plaintiff's retained expert medical consultants review the records.

As further support for an extension of time, Defendants have been dilatory in producing complete, accurate medical, radiology imaging, and billing records. The Defendants delay and/or refusal to produce these records has been unfairly prejudicial to Plaintiff.

Defendant's billing and record keeping practices are also under investigation as part of Plaintiff's case in chief. In this context, a brief extension is reasonable. Plaintiff thus reiterates the request for a brief time to acquire, and review the records. This process must be completed prior to the expert signing the affidavit of merit.

Finally, the Court should be aware that this case was filed in combination with other, related lawsuits against these same Defendant's arising from substantially similar conduct causing similar damages to other Plaintiffs. The wrongful billing scheme was part of a pattern and practice of fraudulently performing medically unnecessary and experimental spine surgeries, while reaping huge financial gains. Many of these cases have been reviewed, and affidavits of merit signed. Each review is expensive, complicated, and takes time.

Based on the other substantially similar claims against Dr. Durrani, Plaintiff's nurse consultant review, and the preliminary medical documents, the case is unquestionably supported by Ohio law. *WHEREFORE*, Plaintiffs respectfully request a ninety (90) day extension to file their affidavit of merit; an opportunity to be heard if the relief is not granted; and Court oversight in the medical records production which have not been timely produced by Defendants, if necessary.

Respectfully submitted,

\s\ Eric C. Deters
**Eric C. Deters (38050)**
**ERIC. C. DETERS & PARTNERS, PSC**
**5247 Madison Pike**
**Independence, KY 41051**
**Phone: (859) 363-1900**
**Fax: (859) 363-1444**
**eric@ericdeters.com**